Shirley HILL, Individually and Mark Anthony Hill, Individually, Plaintiffs–Appellees,

v.

**DEKALB REGIONAL YOUTH DETENTION CENTER, et al., Defendants,**

County of Dekalb, Georgia a/k/a Dekalb Regional Youth Detention Center, Faye Swain, Defendants–Appellants.

Shirley HILL, Individually and Mark Anthony Hill, Individually, Plaintiffs–Appellees,

v.

**DEKALB REGIONAL YOUTH DETENTION CENTER, et al., Defendants,**

County of Dekalb, Georgia a/k/a Dekalb Regional Youth Detention Center, Donald Wilkinson and Dolphus Lewis, Defendants–Appellants.

Nos. 92–8854, 92–9318.

United States Court of Appeals, Eleventh Circuit.

Dec. 27, 1994.

Joan F. Roach, Melinda Bruley White, Robert H. Walling, Dekalb County Attys. Office, Decatur, GA, for Dekalb County.

William C. Joy, Sr. Asst. Atty. Gen., Jennifer L. Hackemeyer, Cynthia Honssinger Frank, Dept. of Law, Atlanta, GA, for Swaine, Wilkinson & Lewis.

Michael T. Bennett, Robert H. Benfield, Jr., Bennett, Callahan & Schloegel, Atlanta, GA, for appellees.

Before ANDERSON and BIRCH, Circuit Judges, ATKINS [*], Senior District Judge.

BIRCH, Circuit Judge:

These consolidated interlocutory appeals arise from denials of summary judgment where governmental employees claimed qualified immunity and the county maintained no responsibility in connection with the sexual assault upon a minor while in the custody of a youth detention center. The district court determined that the individual governmental defendants were ineligible for qualified immunity, and that the county incurred liability through implementation of its policies and procedures. We REVERSE and REMAND.

## I. BACKGROUND

Plaintiff-appellee Mark Anthony Hill, then age sixteen, was in the custody of the Dekalb Regional Youth Detention Center [1] ("DRYDC") in August, 1987.[2] During his detention at DRYDC, Hill experienced various gastrointestinal illnesses. On the afternoon of August 6, 1987, one of the guards advised defendant-appellant Faye Swain, Senior Youth Development Worker [3] at the facility, that Hill was complaining of stomach

---

[*] Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

[1.] The Dekalb Regional Youth Detention Center was acquired by the state and operated by the Georgia Department of Human Resources, Division of Youth Services effective July 1, 1987. Prior to that time, the facility belonged to Dekalb County and was known as the Dekalb Juvenile Detention Center.

[2.] Hill was placed in the custody of the DRYDC on July 27, 1987, after pleading guilty to burglary.

[3.] As Senior Youth Development Worker at the DRYDC, Swain, who worked the 3:00 P.M. to 11:00 P.M. shift, supervised all Youth Development Workers in the absence of a superior officer. Youth Development Workers apparently were DRYDC personnel who worked directly with the detainees, such as guards.

cramps.[4] Swain went to Hill's cell and talked with him concerning his symptoms and general medical condition. She encouraged him to calm down because doctors at Grady Memorial Hospital previously advised that emotional problems and distress could strain his digestive system. Swain gave Hill two Tylenol tablets and Mylagen, a medication for stomach discomfort. She also told him that, if he did not feel better in an hour, then he would be seen by a nurse.

Subsequently, a guard informed Swain that Hill had just reported that he was urinating blood. Swain arranged transportation for Hill to be seen by the nurse at the Dekalb County Police Department, located in the adjacent building. Because of miscommunication by the nurse, Hill was unable to enter the Police Department. Swain then arranged for a urine sample to be provided to the nurse. The nurse reported that there was blood in the urine and advised further medical attention.

Swain arranged for Hill to be transported to Grady Memorial Hospital, which provided medical services for detainees from DRYDC for no charge. Hill waited for care at Grady for eight to ten hours. A second urinalysis performed at the hospital as well as x-rays were negative. Hill was returned to the DRYDC with prescription medication.

Hill arrived at the DRYDC at 4:20 A.M. on August 7, 1987. Swain, who was scheduled to leave work at 11:00 P.M. on August 6, 1987, had remained at the facility until Hill returned because she was concerned about him and had saved his supper for him. She gave Hill his supper, administered his prescription medication, locked him in his cell, and ordered that he be allowed to sleep late

that morning because of his lack of sleep the night before. Swain then left the DRYDC. Thereafter, Hill claims that he was sexually assaulted by two or three adult male members of the DRYDC staff.[5]

Although Hill discovered blood in his underwear between 9:00 A.M. and 10:00 A.M. on August 7, 1987, when he used the bathroom, he did not report this to any DRYDC personnel on the morning shift. Swain returned to work on August 7, 1987, at 3:00 P.M. When Swain checked on Hill at the beginning of her shift, he told her that his stomach was hurting, but conceded at his deposition that she had no reason to think that his complaints were other than a continuation of his ailments from the day before, and that he was constipated. Swain encouraged Hill to calm down and administered his prescription medicine. When Hill said that he was feeling better, Swain left his cell. She instructed two of the guards to check on Hill every fifteen minutes, and she checked on him regularly.

Subsequently, Hill reported to a guard that he had blood in his underwear. The guard observed a blood smear in Hill's underwear and immediately notified Swain, who began arrangements to take Hill to a hospital. Because of the long delay experienced by Hill in receiving medical care at Grady Memorial Hospital the day before, Swain began calls to contact Hill's mother, plaintiff-appellee Shirley Hill, to ascertain if he had private insurance so that he could be seen at nearby Dekalb General Hospital.[6] At approximately 4:30 P.M.,[7] Swain spoke directly with Shirley Hill and asked her to bring her

---

4. Although Swain holds a B.S. degree in history and sociology and has received first aid training, she has no formal medical training. She had a course in recognizing and preventing sexual abuse. Through that training, Swain was aware that bleeding around the buttocks could be a sign of sexual abuse.

5. The alleged perpetrators of the sexual assault are not involved in this appeal.

6. Record evidence explains that detainees at the DRYDC were taken to Grady Memorial Hospital for medical needs because they were seen there

without charge. In emergency situations or instances when detainees had private insurance and did not want to undergo the wait to see a doctor at Grady Memorial Hospital, the detainees would be taken to the nearest hospital.

7. In her affidavit accompanying her summary judgment motion, Swain avers that the guard did not advise her of the blood in Hill's underwear until 6:40 P.M., and that she was unable to reach Shirley Hill until 7:15 P.M. Because a defendant's summary judgment motion based on qualified immunity requires us to construe the facts most favorably to the nonmovant plaintiff(s), we use the Hills' chronology. *Swint v. City of Wad-*

son's insurance card to the DRYDC at 8:00 P.M. after the dinner hour.[8] Shirley Hill, however, promptly left her home for the DRYDC.

When Hill was served dinner in his cell, he reported pain in his abdomen, but that he would attempt to eat. Five minutes later, Hill informed a guard that he was vomiting blood. Swain checked on Hill immediately, determined that he had lost his dinner, and administered his prescription medication.

Following her arrival at the DRYDC, Shirley Hill did not see her son until 6:30 P.M.[9] Hill was transported in a state car[10] to Dekalb General Hospital at approximately 7:45 P.M. During his examination at Dekalb General Hospital,[11] doctors questioned Hill regarding homosexual activity. For the first time, Hill reported that he had been sexually assaulted by adult male personnel at the DRYDC. Hill alleges that he was threatened with his life by his assailants if he disclosed the incident. Hill had never advised Swain or other DRYDC personnel that he was afraid of anyone on the staff. Swain averred by affidavit that she had not observed any unusual or suspicious conduct by

DRYDC staff prior to Hill's assault, and that she had no reason to suspect that the alleged perpetrators, defendants in the district court case, would sexually assault a detainee.

In August, 1989, Shirley and Mark Hill filed in the Northern District of Georgia a complaint alleging constitutional violations pursuant to 42 U.S.C. § 1983 and pendent state tort claims against the DRYDC, Dekalb County, the Georgia Department of Human Resources, and various individuals connected with the DRYDC. Defendants-appellants Swain; Dolphus Lewis, Director of the DRYDC; Donald Wilkinson, Director of Field Services for the Georgia Department of Human Resources, Division of Youth Services; and Dekalb County filed summary judgment motions. The individual appellants, all sued in their individual and official capacities, claimed qualified immunity, and Dekalb County contended that it had no liability because it had no control or jurisdiction over the DRYDC when Hill's sexual assault and alleged unreasonable delay in medical treatment occurred. The district court denied summary judgment; these interlocutory appeals[12] followed.

ley, 5 F.3d 1435, 1441 (11th Cir.1993). As our subsequent analysis reveals, the approximate two-hour difference in Swain's version of the facts is inconsequential.

8. Swain designated 8:00 P.M. to allow for the time that it would take to supervise serving dinner to all of the detainees. Apparently, personnel who would transport Hill to the hospital were needed to assist with the dinner-serving and cleaning-up processes.

9. Shirley Hill claims that she had difficulty entering the DRYDC after her arrival there. Assuming that this is correct, there is no evidence in the record that Swain or the other individual defendants in this appeal were involved in this delay. Further, Swain specifically requested that Shirley Hill not come to the DRYDC until 8:00 P.M., and thus was not expecting her until then.

10. Shirley Hill, who followed the car transporting her son to the hospital, contends that the driver took a circuitous route there. The guard who drove Hill to Dekalb General Hospital, defendant Randolph ("Randy") Marshall, averred in his affidavit accompanying his summary judgment motion that he made a short detour of five to ten minutes duration to stop by his house to obtain his state identification card. Marshall

had not previously transported a detainee to Dekalb General Hospital and understood that a state identification card was required before a detainee could be treated at that hospital. Further, we note that the district court granted Marshall's summary judgment motion because it did not find that he had been inattentive to Hill's medical needs. Indeed, Hill testified at his deposition that Marshall did nothing to prevent him from receiving the medical care that he needed. Marshall was the guard to whom Hill reported the blood in his underwear.

11. The record is unclear concerning how long Hill waited at Dekalb General Hospital to be seen by a doctor or exactly the duration of his hospital medical attention on August 7, 1987. For the purpose of this interlocutory appeal, that information is irrelevant. Any delays caused by the hospital or its personnel do not implicate appellants.

12. The Hills have challenged the timeliness of the appeals in this court by defendants-appellants Lewis, Wilkinson and Dekalb County. After reviewing the record, we have determined that the appeals from denials of the motions for summary judgment are timely and properly before this court. Because the district court's denial regarding Lewis and Wilkinson was denial of the right to file a summary judgment motion rather than denial of their summary judgment motion on the merits, we specifically address our consid-

## II. DISCUSSION

### A. Consideration of Lewis and Wilkinson's Summary Judgment Motion

As an initial procedural issue, we address our consideration of Lewis and Wilkinson's summary judgment motion based on qualified immunity with pendent state claims. The Hills argue that we should not review Lewis and Wilkinson's summary judgment motion because they failed to obtain a substantive decision in the district court, and that their appeal involves only the procedural issue of whether they improperly were denied an extension of time to file their claims of qualified immunity. To resolve this issue, we must review the record and the concerns involved with claims of qualified immunity entitlement.

On August 30, 1991, the district court issued an order directing plaintiffs to serve their discovery responses on defendants "*by* September 6, 1991." R7–148 (emphasis added). The court gave defendants thirty days from the receipt of these discovery responses to file their respective summary judgment motions. Inexplicably, this order was not filed in the clerk's office until September 5, 1991, and it was not entered on the docket until September 9, 1991. Presuming that this order was mailed to counsel, clearly plaintiffs could not have received notice that they were to file their discovery responses by September 6, 1991, and they also were entitled to three additional days to comply with mail notification. Fed.R.Civ.P. 6(e).

The Hills filed discovery responses to DeKalb County and other defendants on September 11, 1991, and filed depositions, including that of Swain, on September 13, 1991. On October 16, 1991, counsel for the State Attorney General representing the governmental defendants, including six individual governmental employees, moved for an extension of time to file summary judgment motions for Lewis and Wilkinson. Counsel explained that defendants had consented to allowing the Hills approximately two and a half months to prepare their discovery responses; that defendants had received the Hills' discovery responses on September 16, 1991; that counsel had worked diligently to prepare summary judgment motions for four

eration of Lewis and Wilkinson's joint summary

of the six individual defendants represented, including Swain; that counsel was unable simultaneously to complete summary judgment motions during the prescribed thirty-day period for Lewis and Wilkinson "[d]espite diligent efforts" because of "the press of legal business, including the reassignment of lead counsel to another division with the State Law Department"; that the case had not been scheduled for trial; and that defendants' motion was "not filed for delay, but rather to obtain the just, speedy and inexpensive determination of this action." R7–157–3.

On November 18, 1991, Lewis and Wilkinson filed a joint summary judgment motion maintaining their entitlement to qualified immunity, including a statement of undisputed facts, and attaching affidavits and other exhibits. In an order issued on April 9, 1992, and filed with the clerk's office on April 13, 1992, the district court denied Lewis and Wilkinson's motion for an extension of time to file summary judgment motions "[b]ecause the court gave defendants ample time to file motions for summary judgment," and denied their summary judgment motion as "moot." R9–190–2. In so determining, the district court concluded that thirty days from September 6, 1991 was sufficient time to prepare summary judgment motions for the governmental defendants, despite the state counsel's reassignment to another division, apparently without considering that the Hills did not file their discovery responses until ten days into the thirty-day prescribed period.

According to the referenced previous order by the district court, defendants had thirty days from *receipt* of plaintiffs' discovery responses to file their summary judgment motions. Since counsel represents that defendants did not receive the Hills' discovery responses until September 16, 1991, the request for extension of time to file the summary judgment motion for Lewis and Wilkinson was within the time period originally prescribed. "When ... by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... with or without motion or notice order the period enlarged if request therefor is made

judgment motion hereinafter.

before the expiration of the period originally prescribed or as extended by a previous order...." Fed.R.Civ.P. 6(b).

On September 10, 1992, Lewis and Wilkinson moved to reopen the time to appeal the district court's denial of their summary judgment motion as moot pursuant to Federal Rule of Appellate Procedure 4(a)(6) because they did not receive notice of the court's order within twenty-one days of its entry. Alternatively, they sought relief under Federal Rule of Civil Procedure 60(b), which permits a party relief from an order for any "reason justifying relief from the operation of the judgment." *Id.* In support of this motion, counsel for Lewis and Wilkinson certified that knowledge of the district court's order denying the summary judgment motion was learned when counsel called on September 2, 1992, to ascertain the status of the motion. Counsel represents that it did not receive a copy of the court's order and requested a copy from the clerk's office. Counsel further represents that, if the district court's order had been received, then Lewis and Wilkinson would have requested that the court reconsider because the court's order was premised upon its presumption that the Hills complied with the court's previous order and served their discovery responses on September 6, 1991. Counsel included the certificate of service showing a service date of September 16, 1991, for the Hills' discovery responses. Not only was this discovery response received three months after the court had granted defendants' prior motion to compel, but also counsel asserts that it was the first time that the Hills substantively had articulated the factual basis for their claims against the multiple defendants represented by defense counsel. If the district court's order denying summary judgment had been received by counsel for defendants and the court had not reconsidered after knowledge of these facts, then counsel represents that the order denying Lewis and Wilkinson's summary judgment motion based on qualified immunity would have been appealed to this court.

On December 14, 1992, the district court denied Lewis and Wilkinson's request for relief from its April 13, 1992 order denying their summary judgment motion, but granted their request for an extension of time to appeal and reopened the time for appeal for fourteen days. On December 28, 1992, Lewis and Wilkinson timely appealed the district court's April 13, 1992 order denying their request for an extension of time to file their summary judgment motion and denying their summary judgment motion based on qualified immunity as moot.[13] While the appeal from the district court's denial of Lewis and Wilkinson's summary judgment motion is properly before us, the district court has not considered the merits of their joint summary judgment motion based on qualified immunity because it denied the motion as untimely.[14]

■ Although not considered by the district court substantively, we will consider Lewis and Wilkinson's summary judgment motion based on qualified immunity for several reasons. First, the motion was filed in the district court and is part of the record on appeal. The district court could have considered their summary judgment motion, but found it untimely and chose not to do so. Second, pendent jurisdiction and the doctrine of judicial economy permit us to exercise jurisdiction over related claims when other claims are properly reviewable. *See Schmelz v. Monroe County,* 954 F.2d 1540, 1543 (11th Cir.1992) (per curiam); *see also Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1509 (11th Cir.1990) ("Pendent jurisdiction is properly exercised over nonappealable decisions of the district court when the reviewing

---

13. This notice of appeal is denominated as the Second Notice of Appeal by defendants Lewis and Wilkinson because, on September 10, 1992, they joined the timely appeal of Swain from the denial of her summary judgment motion based on qualified immunity. At that time, however, Lewis and Wilkinson's appeal was untimely and the district court had not reopened the time for their appeal from the denial of their summary judgment motion.

14. Contrary to Lewis and Wilkinson's argument that their case is not moot and is a "live" controversy, we believe that they misapprehend the district court's denial of their summary judgment motion because it was moot. It is apparent that the district court determined that their summary judgment motion was moot because it was untimely and, therefore, could not be considered.

court already has jurisdiction over one issue in the case."). Not only is denial of summary judgment based on qualified immunity properly reviewable as an interlocutory appeal, but also the determination of Swain's entitlement to qualified immunity is related to that of Lewis and Wilkinson since the same incident is the basis for the cause of action against these individuals. *See Schmelz,* 954 F.2d at 1543. Third, qualified immunity significantly is not a defense to liability; "[t]he entitlement is an *immunity from suit."* *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Since qualified immunity protects government officials performing discretionary functions from litigation, including discovery and trial, the validity of this protection must be determined as early as possible in the lawsuit. *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc).

■ Thus, qualified immunity is distinct from the merits of a case. This immunity effectively would be lost if Lewis and Wilkinson were "erroneously permitted to go to trial." *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815; *see Collins v. School Bd.,* 981 F.2d 1203, 1205 (11th Cir.1993) (per curiam) (finding that qualified immunity is violated if government officials are forced to litigate claims from which they are immune merely because other claims, such as state law claims, are alleged against them). Although it reopened the time period within which Lewis and Wilkinson could appeal, the district rejected the opportunity to review their claims of qualified immunity and, presumably, would send these governmental defendants to trial. Therefore, this court appropriately must resolve Lewis and Wilkinson's claims of qualified immunity protection.[15]

B. *Qualified Immunity*

1. Review Principles

"The denial of qualified immunity is a question of law reviewed *de novo."* *Belcher v. City of Foley,* 30 F.3d 1390, 1395 (11th Cir.1994). Because qualified immunity procedurally is an affirmative defense to personal liability, "failure to plead qualified immunity may result in a waiver of the defense." *Moore v. Morgan,* 922 F.2d 1553, 1557 (11th Cir.1991). All of the individual appellants raised qualified immunity in their collective answer. Thus, this affirmative defense is procedurally available to them.

■ Qualified immunity *usually* protects government actors in their individual capacities[16] from civil claims against them,

15. We do not want to be understood as condoning counsel's filing a motion for extension of time to file summary judgment motions for Lewis and Wilkinson on the last day that summary judgment motions were due as ordered. Given the reasons advanced by defense counsel for not being able to meet this filing deadline, counsel surely realized before this final date that the summary judgment motions for Lewis and Wilkinson would not be filed when ordered. It would have been better practice for counsel to have notified the court of the inability to file summary judgment motions for these two of the multiple defendants represented when that fact became obvious, rather than waiting until the due date. The district court could well have grown weary with the dilatoriness of all counsel in this case, which had been before that court since 1989, and reacted accordingly. We want to be clear that we address Lewis and Wilkinson's summary judgment motion because the Supreme Court has instructed that claims of qualified immunity must be determined pretrial or the doctrine would be meaningless and this protection effectively would be denied. *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815; *see Harlow v. Fitzgerald,* 457 U.S. 800, 817–19, 102 S.Ct. 2727,

2738–39, 73 L.Ed.2d 396 (1982); *Green v. Brantley,* 941 F.2d 1146, 1150–51 (11th Cir.1991) (en banc). We do not want to encourage filing *any* motion for an extension of time on the last day that a response is due pursuant to a previous judicial order.

16. "It is well-settled that qualified immunity only protects public officials from lawsuits brought against them in their individual capacity." *Harrell v. Decatur County,* 22 F.3d 1570, 1576 (11th Cir.1994). A plaintiff who sues a public official for alleged civil rights violations in his or her individual capacity seeks money damages from the individual officer directly. *Swint,* 5 F.3d at 1441. In contrast, "suits against an official in his or her official capacity are suits against the entity the individual represents." *Parker v. Williams,* 862 F.2d 1471, 1476 n. 4 (11th Cir. 1989). "[O]fficial capacity suits represent 'only another way of pleading an action against an entity of which an officer is an agent,' and a victory against a named individual in an official capacity suit is 'a victory against the entity that employs him.' " *Hobbs v. Roberts,* 999 F.2d 1526, 1530 (11th Cir.1993) (quoting *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099,

provided that their challenged discretionary conduct [17] does not violate clearly established federal law. *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc). To be "clearly established," the federal law by which the government official's conduct should be evaluated must be preexisting, obvious and mandatory so that a similarly situated, reasonable government agent would be on notice that his or her questioned conduct violates federal law under the circumstances. *Id.* at 1149–50. "The qualified immunity doctrine means that government agents are not always required to err on the side of caution." *Id.* at 1149 (citing *Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984)). "Objective legal reasonableness is the touchstone" by which the conduct of a governmental actor must be measured to determine if qualified immunity is applicable. *Id.* at 1150; *see Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (the effect of the objective-reasonableness test is that qualified immunity protects "all [government actors] but the plainly incompetent or those who knowingly violate the law"). When the qualified immunity defense has been raised concerning prison conditions affecting safety and medical needs, an opposing plaintiff must convince the court that the law clearly established that "the

defendant's conduct *in the circumstances* amounted to 'deliberate indifference.' " *Edwards v. Gilbert,* 867 F.2d 1271, 1275 (11th Cir.1989) (emphasis added), *modified on other grounds,* 23 F.3d 358 (11th Cir.1994). With these guiding principles, we must determine whether the individual appellants in this case are entitled to qualified immunity.

2. Swain

The Hills argue that Swain failed to recognize a serious medical condition, the sexual assault, and that she intentionally delayed appropriate medical attention. Denying qualified immunity to Swain, the district court concluded that the blood in Hill's underwear was evidence of sexual abuse, and, consequently, Swain "violated clearly established law by deliberately delaying plaintiff Mark Hill's receipt of proper medical care" for approximately four hours. R9–198–8. Significantly, the district court did not analyze the objective reasonableness of Swain's determination that Hill's medical condition did not warrant immediate medical treatment.

The Eighth Amendment [18] prohibition against "cruel and unusual" punishment mandates that those who are incarcerated after criminal conviction [19] must not be

---

3105–06, 87 L.Ed.2d 114 (1985)). Governmental entities are not entitled to qualified immunity regarding section 1983 claims. *Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980); *see Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (holding that states and state officials acting in their official capacities are not "persons" subject to section 1983 liability). Therefore, we will consider the Hills' claims against Swain, Wilkinson and Lewis in their official capacities to be claims against Dekalb County, discussed hereinafter. *See Burrell v. Board of Trustees,* 970 F.2d 785, 789 n. 10 (11th Cir.1992), *cert. denied,* ― U.S. ―, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993).

17. A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority. *Hudgins v. City of Ashburn,* 890 F.2d 396, 404 (11th Cir.1989). There is no evidence in the record that the individual appellants were not acting within their discretionary authority when their respectively questioned conduct transpired,

and the Hills have not claimed otherwise. Accordingly, we conclude that the individual appellants acted within the scope of their discretionary authority in their challenged conduct in this case.

18. The Eighth Amendment applies to states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

19. Hill's "detention" actually was his sentence because he had pled guilty to a burglary charge. *See Blohm v. Commissioner,* 994 F.2d 1542, 1554 (11th Cir.1993) ("[T]here is no difference between a judgment of conviction based upon a guilty plea and a judgment rendered after a trial on the merits."). Therefore, we use an Eighth Amendment analysis. The Supreme Court has held that a pretrial detainee or an individual who has not had a formal adjudication of guilt asserts constitutional claims concerning conditions of incarceration, such as medical needs, under the Due Process Clause of the Fourteenth Amendment and not the Eighth Amendment. *City of*

subjected to punishment that involves "the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). The Supreme Court specifically has held that *"deliberate indifference* to *serious medical needs* of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." [20] *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (emphasis added) (quoting *Gregg,* 428 U.S. at 173, 96 S.Ct. at 2925). Neither "inadvertent failure to provide adequate medical care" nor a physician's "negligen[ce] in diagnosing or treating a medical condition" states a "valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 105, 106, 97 S.Ct. at 292. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. at 292. "A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Hamilton v. Endell,* 981 F.2d 1062, 1066 (9th Cir.1992).

. The *Estelle* "deliberate indifference to serious medical needs" standard has an objective and a subjective component. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (subjective component); *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (objective component). The objective component of an Eighth Amendment claim is "contextual and responsive to 'contemporary standards of decency.'" *Hudson v. McMillian,* —— U.S. ——, ——, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (quoting *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290). Regarding the subjective component, "[t]his court has consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference." *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir.1989). To analyze Swain's responsive conduct upon learning of blood in Hill's underwear, we first must evaluate "whether there was evidence of a serious medical need" to determine if the four-hour delay in acquiring medical attention was unwarranted, such that it "amounted to deliberate indifference." *Id.* (citing *West v. Keve,* 571 F.2d 158, 161 (3d Cir.1978) (recognizing that the "deliberate indifference" standard is "two-pronged," consisting of deliberate indifference by prison officials in response to a prisoner's "serious" medical needs)).

### a. Serious Medical Needs and Treatment Delay

■■■ "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson,* —— U.S. at ——, 112 S.Ct. at 1000. In *Estelle,* the Court recognized that medical needs constitutionally requiring medical attention ranged from "the worst cases," producing "physical torture or a lingering death," to "less serious cases," resulting from the "denial of medical care," which could cause "pain and suffering." *Estelle,* 429 U.S.

*Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Tittle v. Jefferson County Comm'n,* 10 F.3d 1535, 1539 n. 3 (11th Cir.1994) (en banc). Nevertheless, our circuit has determined that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir.1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). Accordingly, our analysis includes cases involving convicted prisoners as well as pretrial detainees.

**20.** In accordance with the " 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency' " upon which the Eighth Amendment is based, *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (citation omitted), a government is obliged "to provide medical care for those whom it is punishing by incarceration," *id.* at 103, 97 S.Ct. at 290; *see Wellman v. Faulkner,* 715 F.2d 269, 271 (7th Cir.1983) ("When a [government] imposes imprisonment as a punishment for crime, it accepts the obligation to provide persons in its custody with a medical care system that meets minimal standards of adequacy."), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984).

at 103, 97 S.Ct. at 290. In 1987, when Hill's alleged medical mistreatment occurred, a federal court had determined that "[a] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H.1977). This standard has been acknowledged and used by other federal circuit and district courts. *See, e.g., Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990) (per curiam), *cert. denied,* 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991); *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Casey v. Lewis,* 834 F.Supp. 1477, 1543 n. 1 (D.Ariz.1993); *Hare v. City of Corinth,* 814 F.Supp. 1312, 1321 (N.D.Miss.1993); *Johnson v. Vondera,* 790 F.Supp. 898, 900 (E.D.Mo.1992). Not only was the *Laaman* standard established for a decade at the time that Swain allegedly violated Hill's Eight Amendment rights, but also we believe it to be the appropriate and guiding principle by which to gauge "serious medical needs" of prisoners.

Both aspects of the *Laaman* test are pertinent to the Hills' claim of delay in appropriate medical treatment by Swain. The previous day, a doctor at Grady Memorial Hospital had diagnosed Hill's medical complaints as a gastrointestinal condition for which he had prescribed medication. Swain personally had administered this medicine to Hill and monitored him closely for this *diagnosed* medical problem. Thus, the mandated treatment for his diagnosed ailment undisputedly was received by Hill. *Cf. Aldridge v. Mont-*

*gomery,* 753 F.2d 970, 972–73 (11th Cir.1985) (per curiam) (holding that a state prisoner demonstrated a triable issue of fact when he presented evidence that a deputy failed to administer an ice pack and pain medication as instructed by attending doctor after suturing a wound).

Because Swain was a layperson and not a physician, we also examine her response and reaction to learning of blood in Hill's underwear to determine if "a lay person would easily recognize the necessity for a doctor's attention" under those circumstances. *Laaman,* 437 F.Supp. at 311. Clearly, Swain did recognize the need for a physician's attention because she contacted Hill's mother to see if he had insurance so that he could be taken to Dekalb General Hospital. The Hills, however, complain that the four-hour delay in Hill's transportation to the hospital, the cause of which was occasioned by Swain's overseeing the serving of dinner to the DRYDC inmates, was unwarranted. Consequently, we must review Swain's response upon learning of blood in Hill's underwear to determine if his medical condition required immediate or emergency attention.

Delay in access to medical attention can violate the Eighth Amendment, *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291, when it is "tantamount to 'unnecessary and wanton infliction of pain,'" *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir.) (per curiam) (quoting *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990). Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem.[21] In contrast, delay or

---

21. *See, e.g., Brown,* 894 F.2d at 1538 (six-hour delay in medical treatment for "a serious and painful broken foot was sufficient to state a constitutional claim"); *Thomas v. Town of Davie,* 847 F.2d 771, 772 (11th Cir.1988) (automobile accident where the individual was "'in obvious need of immediate medical attention,'" because of his "'medically emergent and deteriorating ... condition'"); *H.C. ex rel. Hewett v. Jarrard,* 786 F.2d 1080, 1086–87 (11th Cir.1986) (three-day delay in medical treatment for shoulder inju-

ry was "'reckless disregard'" for detainee's serious medical need and was a constitutional violation); *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 702 (11th Cir.1985) (valid constitutional claim where inmate died of leukemia four months after complaining of "serious" medical problems, including swollen ankles, inability to sleep, chills, hyperventilation, severe pain in back and right leg, and double vision, and county jail defendants made no arrangements for a doc-

even denial of medical treatment for superficial, nonserious physical conditions does not constitute an Eighth Amendment violation.[22]

The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. *Gaudreault*, 923 F.2d at 208; *Monmouth County*, 834 F.2d at 347. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious."[23] *Id.* An in-

mate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.[24] Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." *Harris v. Coweta County*, 21 F.3d 388, 393–94 (11th Cir.1994) (emphasis added). Consequently,

---

tor's examination until compelled to do so by two court orders); *Aldridge*, 753 F.2d at 972 (one-and-a-half-inch cut over detainee's eye bleeding for two and a half hours before sutured at a hospital); *Hughes v. Noble*, 295 F.2d 495, 496 (5th Cir.1961) (per curiam) (following automobile accident, individual jailed for thirteen hours with broken neck and forced to endure "severe pain" despite "repeated requests for medical attention"); *see also Cooper v. Dyke*, 814 F.2d 941, 945–46 (4th Cir.1987) (detainee's gunshot wound required immediate medical attention and delay in providing it caused shock and extensive internal bleeding).

**22.** *See, e.g., Shabazz v. Barnauskas*, 790 F.2d 1536, 1538 (11th Cir.) (per curiam) (state inmate's "'pseudofolliculitis' or 'shaving bumps,'" even if shaving required by prison officials when physician ordered otherwise, "does not rise to the level of the cruel and unusual punishment forbidden by the Eighth Amendment"), *cert. denied*, 479 U.S. 1011, 107 S.Ct. 655, 93 L.Ed.2d 709 (1986); *Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir.) (per curiam) (county inmate's high blood pressure presented "'no true danger' or 'serious threat' to his health," and he also had full range of motion in his shoulder despite continuing pain from a three-year-old injury; further, he obtained a medical examination the day after he requested it), *cert. denied*, 439 U.S. 897, 99 S.Ct. 259, 58 L.Ed.2d 244 (1978); *see also Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (state prisoner's swollen, bleeding wrists from handcuffs that were too tight "do not constitute such a 'serious medical need' that any minor delay caused by [prison officials] in delivering [inmate] to the care of medical personnel could be construed as 'deliberate indifference'"); *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (while sliver of glass in detainee's palm "was no doubt uncomfortable," it nevertheless "was not a serious injury" and fourteen-hour delay in medical treatment "did not violate his constitutional rights" because cuts and bruises were "minor" and "did not require either stitches or painkiller").

**23.** *See, e.g., Ancata*, 769 F.2d at 702 (death); *Matzker v. Herr*, 748 F.2d 1142, 1147–48 (7th Cir.1984) (following a prison fight, inmate's denial of medical treatment for eye injury and three

broken teeth for three months was an Eighth Amendment violation); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir.1984) (alleged intentional delay in emergency medical care for pregnant inmate who miscarried); *Ramos*, 639 F.2d at 576 (delay in providing state prisoner's oral surgery caused "continued and unnecessary pain and loss of teeth"); *see also Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir.1976) ("[A] prisoner states a proper cause of action when he alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury.").

**24.** *Compare Czajka v. Caspari*, 995 F.2d 870, 872 (8th Cir.1993) (per curiam) (no evidence that delay in inmate's orthopedic surgery "'so deviated from professional standards that it amounted to deliberate indifference'" (citation omitted)); *Ervin v. Busby*, 992 F.2d 147, 150–51 (8th Cir.) (per curiam) (although inmate was deprived of prescription anti-depressant medication for approximately a month, during which time he incited a riot, doctor testified that suddenly stopping medication should not have caused undue agitation; prison officials' negligence in not refilling prescription was not deliberate indifference), *cert. denied*, —— U.S. ——, 114 S.Ct. 220, 126 L.Ed.2d 176 (1993); *Gaudreault*, 923 F.2d at 208 (although hospital records showed that arrestee displayed multiple bruises to the forehead, left and right orbits of his eyes, nasal area, left ribs, right flank and left shoulder, and was suffering from abrasions to the cornea and upper back, consistent with alleged assault by police officer, there was "nothing in the record to suggest" that a ten-hour delay in medical treatment exacerbated these injuries "in the slightest"); *Martin*, 849 F.2d at 871 (police officers did not violate arrestee's constitutional rights by fourteen-hour delay in obtaining medical treatment for cut under his eye that had stopped bleeding and removal of quarter-inch piece of glass embedded in his palm because there was "no suggestion that the delay in taking him to the hospital exacerbated his injuries in any way") *with Wellman*, 715 F.2d at 273–74 (medical expert testified that five hours delay between time inmate went into cardiovascular shock and the time he was taken to the hospital caused his death).

delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

Mindful of this guidance, we assess the objective reasonableness of Swain's actions upon learning of blood in Hill's underwear. As Hill admitted at his deposition, it was reasonable for her to think that the blood in his underwear was a continuation of the urination of blood and gastrointestinal problems that he had been experiencing and for which he had been taken to Grady Memorial Hospital and treated the day before, arriving back at the DRYDC in the early morning hours of August 7, 1987. The doctor who examined Hill at Grady Memorial Hospital testified by deposition that blood in the underwear also could result from hemorrhoids, ulcers or constipation. These are not life-threatening conditions requiring immediate, emergency medical attention. Hill admitted that he was constipated, and he had vomited blood with the dinner that he lost, indicating that there was blood that also could have entered his intestinal tract.

Significantly, as Hill testified in his deposition, he noticed the blood in his underwear between 9:00 A.M. and 10:00 A.M.; yet he did not reveal this fact to anyone until approximately 4:30 P.M. The greatest delay in medical treatment, therefore, was attributable to Hill's silence. Additionally, Hill has not contended that there was continued bleeding that would signify an urgent or emergency situation, but only that there was a blood "smear" in his underwear, which necessarily would have been dried blood because it had been there since that morning. *Compare Aldridge,* 753 F.2d at 971 (directed verdict inappropriate for county jail officials who ignored bleeding cut over eye for two and a half hours, although there was "a pool of blood on the floor approximately the size of two hands" and blood on the inmate's shirt and coat) *with Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir.1988) (no Eighth Amendment violation for fourteen-hour delay in treatment of cut over eye because bleeding had stopped and delay did not exacerbate the injury). We do not view as objectively unreasonable and illogical Swain's considering the blood in Hill's underwear as being a continuation of his gastrointestinal problems for which she then was medicating him and not speculating that the blood could have resulted from a new and unsuspected condition, sexual assault.

Nevertheless, Swain did respond upon learning of blood in Hill's underwear and began arrangements to transport him for the second time in two consecutive days to a hospital. Under the circumstances of Hill's gastrointestinal ailments, the blood in his underwear objectively did not constitute a "serious" medical condition warranting immediate or emergency medical attention.[25] Because Hill's condition did not appear urgent, Swain determined that she could wait until after serving supper to the detainees, when, apparently, personnel would be available to transport him to the hospital.

Further, she did not delay unreasonably in transporting Hill to a hospital. Given the experience of the previous day, when Hill had waited eight to ten hours to be examined at Grady Memorial Hospital, Swain obviously was trying *to expedite* and not to delay his medical treatment by arranging for him to go to proximate Dekalb General Hospital, where she thought that he would be seen sooner as

---

**25.** We are cognizant that our court has recognized that repeated violent beatings coupled with sexual assaults of an inmate and consequent denial of medical attention can violate the Eighth Amendment. *Barfield v. Brierton,* 883 F.2d 923, 938–39 (11th Cir.1989) (summary judgment for defendant prison officials reversed); *see Brown,* 894 F.2d at 1538 n. 4 (beating and sexual assault in *Barfield* demonstrated a serious medical condition). We distinguish this case factually and legally. The inmate in *Barfield* demonstrated the deliberate indifference of the prison officials because he *continually told* them of the *repeated* attacks *and rapes* from another inmate and *requested medical attention.* Since Hill told no one at DRYDC that he had been sexually assaulted, Swain could not have been indifferent or unresponsive to this particular condition because she had no knowledge of it. Further, she did arrange medical treatment for him within a reasonable time albeit for the apparent continuation of his gastrointestinal problem. Importantly, for qualified immunity purposes, Swain cannot be held responsible for knowledge of *Barfield,* decided by this court in September, 1989, because it was not clearly established law in August, 1987. *Lassiter,* 28 F.3d at 1150.

a private patient.[26] Four hours is not an excessive delay breaching the Eighth Amendment for a reasonably apparent, non-emergency medical condition. *See Kane v. Hargis*, 987 F.2d 1005, 1009 (4th Cir.1993) (per curiam) (four-hour delay in medical attention for cracked teeth, a cut nose, and a bruised face sustained during arrest was not a constitutional violation because there was "no indication these injuries required immediate medical treatment").

Importantly, the Hills have not indicated how, or even if, the four-hour delay in transporting Hill to a hospital exacerbated his medical condition resulting from the sexual assault. Hill had not disclosed the sexual assault, and the blood smear in his underwear was insufficient to evidence an urgent or emergency medical need necessitating immediate medical attention. Whatever injury was caused by the regrettable, reprehensible sexual assault that occurred approximately twelve hours earlier, when Swain was not present at the DRYDC, could not have been alleviated by her, even if she had transported Hill to a hospital immediately upon learning of blood in his underwear.

The Hills have submitted no medical evidence explaining how the four-hour delay in taking Hill to the hospital detrimented or worsened his medical condition. The record does not indicate what, if any, treatment was provided by the examining doctor or if medication was prescribed. Discovery of sexual assault is different from medical treatment

or the need for medical attention. The Hills make a bare, unsupported assertion that "[i]t is rather common knowledge that *any* delay following a sexual assault will cloud the forensic waters." Appellees' Brief at 33 (emphasis added). Without medical evidence contrariwise, we are unpersuaded that the four-hour delay in transporting Hill to a hospital was more detrimental for forensic purposes than the approximate twelve-hour delay following the sexual assault caused by Hill's silence.[27] When Hill was asked at his deposition if Swain did anything that prevented him from receiving the medical care that he needed, he responded "No." Deposition of Mark Anthony Hill at 111. Consequently, the objective facts in this case do not demonstrate that Hill had a "serious" medical need requiring immediate medical attention, that the four-hour delay in transporting him to a hospital was unreasonable, or that this delay exacerbated Hill's medical condition.

### b. Determination of Deliberate Indifference

■ Having reviewed the relation between a serious medical need and treatment delay, we are in a position to assess Swain's subjective or cognitive response upon learning of blood in Hill's underwear and the consequent four-hour delay in transporting him to a hospital to determine if this amounted to deliberate indifference to his sexual assault. In *Whitley v. Albers*, 475 U.S. 312,

---

**26.** We have noted that delaying *"necessary"* medical treatment for nonmedical reasons, such as coercing payment, can show deliberate indifference sufficient to establish a constitutional violation. *H.C. ex rel. Hewett*, 786 F.2d at 1086 (emphasis added); *Ancata*, 769 F.2d at 704; *cf. Cookish v. Cunningham*, 787 F.2d 1, 3, 6 (1st Cir.1986) (per curiam) (three-day delay in treating inmate's infected tooth awaiting potential of private medical care was not an Eighth Amendment violation). This case, however, is distinguishable. First, we interpret "necessary" medical treatment to indicate the need for urgent or emergency medical care, or a "serious" medical need. On the facts of this case, Hill's condition objectively was not in this category. Second, Swain was trying to hasten and not to delay Hill's medical attention by having him examined as a private patient. The long delay in Hill's being seen by a doctor the day before at the public hospital to which DRYDC detainees usual-

ly were taken prompted Swain to arrange to take him to a private hospital. Had Hill returned to the public hospital, he might have waited as long or longer as he had the day before and, potentially, the delay in his receiving medical treatment could have been longer than the four hours about which he complains. Third, the Hills do not specifically argue that Swain erred in arranging for Hill to go to a private hospital; they fault her for delaying in transporting him there for four hours, until after dinner was served to the detainees.

**27.** Additionally, we are unconvinced that the Eighth Amendment in the context of medical needs applies to forensic testing as opposed to physical condition. The Hills have provided no authority for the proposition that the preservation of evidence constitutes a serious medical need, and we have found none.

106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), a case concerning a state prisoner who was shot by a prison official quelling a riot, the Court held that "[i]t is obduracy and wantonness, not inadvertence or error in good faith" that violates the Eighth Amendment in "supplying medical needs."[28] *Id.* at 319, 106 S.Ct. at 1084. "A defendant must *purposefully ignore or fail to respond* to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin v. Smith,* 974 F.2d 1050, 1060 (9th Cir.1992) (emphasis added). Implicit in the *Estelle* deliberate indifference standard is *knowledge* of the *particular medical condition* in order to establish intent or "a sufficiently culpable state of mind," *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324, *to deny or to delay purposely* "access to medical care" or intentionally to interfere "with the treatment once prescribed," *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291. Thus, "*[k]nowledge* of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is *essential* to a finding of deliberate indifference."[29] *Horn ex rel. Parks v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.) (emphasis added), *cert. denied,* —— U.S. ——, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); *see Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir.1989).

In this case, Swain *did not know* that Hill had been sexually assaulted when the guard reported to her that there was blood in his underwear.[30] She had no reason to suspect such an occurrence from his behavior, in the context of his gastrointestinal problems and stomach-ache complaints for which he was being treated, or the conduct of DRYDC personnel. Indeed, Hill did not disclose the sexual assault until he was examined by a doctor at Dekalb General Hospital on the evening of August 7, 1987. The district court apparently was persuaded by the Hills' arguments that blood in underwear is evidence of sexual abuse, and that Swain's training from a course in recognizing sexual assault should have alerted her to this fact. The Supreme Court does not consider physicians who are negligent in diagnosing or treating a medical condition to be in violation of the Eighth Amendment. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Swain, a layperson, clearly cannot be held to a higher standard merely because she had a course in sexual abuse.

Significantly, Swain did not exhibit the wanton mental state for an Eighth Amendment violation. To the contrary, she had given Hill extraordinary care and medical attention. She was so concerned about his medical condition that she had remained at

---

**28.** We are cognizant that the Supreme Court now has defined "deliberate indifference" as requiring more than negligence, but less than conduct undertaken to cause harm. *Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). The Court has adopted a "subjective recklessness" standard from criminal law so that a prison official is not deliberately indifferent unless the individual "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1979, 114 S.Ct. at 1979. We do not base our analysis of this case on this new standard because it was not the law in 1987, when Swain's challenged conduct occurred. *See Lassiter,* 28 F.3d at 1150. Further, *Farmer* specifically concerns prison safety rather than inmates' medical needs.

**29.** *See Wilson,* 501 U.S. at 299–301, 111 S.Ct. at 2325 ("The long duration of a cruel prison condition may make it easier to *establish* knowledge and hence some form of intent...."); *Harris,* 21 F.3d at 394 ("[D]eliberate indifference could be

inferred from an unexplained delay in treating a *known or obvious* serious medical condition."); *see also Brown,* 894 F.2d at 1539 (affirming summary judgment for state prison officials because there was no evidence that they were aware that inmate had broken his foot on the day that it occurred and sending him to a hospital upon knowledge of this fact precluded finding deliberate indifference); *Loe v. Armistead,* 582 F.2d 1291, 1292, 1296 (4th Cir.1978) (prison officials who delayed twenty-two hours in obtaining doctor's care for inmate's obviously broken arm showed deliberate indifference because the arm was swollen, "locked in an extraordinary position" and it was an "excruciating injury"), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980).

**30.** *Cf. Love v. Sheffield,* 777 F.2d 1453, 1454–55 (11th Cir.1985) (per curiam) (a reasonable person could find that there was awareness both of danger and need for medical treatment, yet a choice not to supply protection and medical assistance when county sheriff refused to provide medical care for detainee whom he confined with violent prisoners, who assaulted and injured detainee).

the DRYDC from 11:00 P.M. on August 6, 1987, after the end of her shift, until approximately 5:00 A.M. the next morning, waiting for Hill to return from Grady Memorial Hospital. Upon his return at 4:20 A.M., she still stayed to give him his supper that she had saved for him, administered his prescription medication, and ordered that he be allowed to sleep late that morning because of his lack of sleep the night before. She checked on him upon her arrival at the DRYDC at 3:00 P.M. on August 7, 1987, administered his medicine when he told her that his stomach still hurt, did not leave his cell until he told her that he felt better, personally monitored him regularly, and requested that the guards check on him every fifteen minutes. She also informed him that he would have further medical attention if his problems continued. When advised of blood in Hill's underwear, she took appropriate measures under the *known* circumstances, as we have analyzed.

"Absent evidence of ' "conscious or callous indifference to a prisoner's rights," ' the mere fact of an inmate's injury is insufficient to state a claim of deliberate indifference." *Mandel*, 888 F.2d at 788 (citations omitted); *see Mooreman v. Sargent*, 991 F.2d 472, 474 (8th Cir.1993) (although state inmate was raped by three inmates on four successive nights, prison guards, who did not know of the sexual attacks, did not exhibit deliberate indifference or reckless disregard for the victim in violation of the Eighth Amendment). Under the clearly established law at the time, we conclude that Swain's conduct upon learning of blood in Hill's underwear was not " 'an unnecessary and wanton infliction of pain' " or " 'repugnant to the conscience of mankind' " to amount to actionable deliberate indifference under the Eighth Amendment. *Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 292 (citation omitted). Swain is entitled to qualified immunity because she violated no clearly established Eighth Amendment law in August, 1987. The district court should have granted her summary judgment motion based on qualified immunity.

### 3. Lewis and Wilkinson

■ To recover individually from Lewis and Wilkinson, who were in supervisory or policymaking capacities, the Hills must show that they are liable either through their "personal participation" in the acts comprising the alleged constitutional violation or "the existence of a causal connection" linking their actions with the violation. *H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1086–87 (11th Cir.1986). In affidavits accompanying their motion for summary judgment, Lewis and Wilkinson aver that they were not present at the DRYDC during the relevant time period of Hill's alleged sexual assault. *Cf. id.* at 1087 (defendant superintendent of juvenile detention center "personally inflicted" injury to detainee's shoulder by throwing him "against the wall and metal bunk in the isolation cell," and he authorized and imposed an isolation period in excess of guidelines, which "delayed [the detainee's] medical attention by three days"). They also attest that they neither assisted nor acquiesced in the alleged sexual assault. Further, they were not directly involved in any decision concerning transporting Hill to a hospital after the revelation of blood in his underwear. No contrary evidence was placed in the record. Thus, there was no direct personal participation of Lewis and Wilkinson in the sexual assault on Hill or any subsequent delay in his acquiring medical attention.

In addition to personally participating in acts causing constitutional deprivations, Lewis and Wilkinson also could be liable to the Hills indirectly if they personally instigated or adopted a policy that violated Hill's constitutional rights. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 706 (11th Cir.1985) (a supervisor is "fully responsible for his own actions and/or policies" that deprive a detainee of constitutional rights). "Supervisors ... can be held liable only on the basis of their own acts or omissions, amounting at the least to 'reckless' or 'callous' indifference to the constitutional rights of others." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 209 (1st Cir.1990) (per curiam), *cert. denied*, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991).

■ In his affidavit, Lewis, as Director of the DRYDC, avers that he formulated procedures in accordance with the American Correctional Association Standards for Juvenile

Detention Facilities for the DRYDC and made certain that employees were screened for a criminal record in accordance with those national standards. In supervising his employees, he implemented policies designed to minimize assaults on detainees, such as instituting procedures devised to identify employees with a propensity to assault residents, encouraging employees to report abusive or inappropriate conduct of coworkers, and counseling employees. The DRYDC was equipped with audio-monitoring devices and mirrors to enable staff to observe detainees.[31] The detainees were under direct observation of the staff during the day, and the personnel were required to check the residents every thirty minutes at night. The Constitution does not require "a prison to station a full-time guard outside each cell to prevent" sexual assaults from occurring. *Mooreman v. Sargent*, 991 F.2d 472, 474 (8th Cir.1993).

Lewis further avers that his policy and practice has been to ensure prompt and adequate medical care for detainees. *Cf. Colle v. Brazos County*, 981 F.2d 237, 246 (5th Cir. 1993) (sheriff not entitled to qualified immunity because he knew or should have known that failing to provide staff to transfer a seriously ill detainee to a hospital and failing to monitor critical medical needs of a detainee was constitutionally deficient and could result in death). When advised of Hill's stomach complaints, Lewis directed staff to take Hill to a hospital if he did not improve after taking his prescribed medicine. When Lewis became aware of Hill's allegations, he immediately suspended the four employees on duty at the time of the alleged incident and transferred Hill to another youth detention center. He requested an outside investigation; upon receiving the investigation report, he terminated the responsible parties.

We do not find the requisite causal connection between the policies and procedures implemented by Lewis and the sexual assault and temporary delay in medical care for Hill.

To the contrary, this was precisely the type of occurrence that Lewis sought to prevent with the policies and procedures that he instituted. The Hills appear to fault Lewis simply because the sexual assault occurred, thus evidencing that these policies and procedures were insufficient. While the sexual assault on Hill is indeed tragic, the policies and procedures instituted by Lewis do not demonstrate the necessary callous indifference in policymaking to hold Lewis personally or individually liable. Instead, it appears that he was administering the DRYDC to the best of his ability with the resources that he had at a temporary location. Further, additional monitoring likely would have involved funding that simply was not available to him or out of his control and may not have prevented Hill's sexual assault. Even sophisticated prison surveillance equipment and techniques are not fail-safe. *See Mooreman*, 991 F.2d at 473 (although state prison was equipped with a "control booth" occupied "with a security officer twenty-four hours a day" and there was an additional "observation booth" from which prison officials periodically observed inmates, a prisoner was raped by three inmates on four consecutive nights because they unscrewed the light bulb in the victim's cell and used a blanket to conceal the bottom bunk where the rapes occurred).

Specifically, the Hills have not indicated particular constitutional concerns regarding the American Correctional Association Standards for Juvenile Detention Facilities, the basis for Lewis's policies and procedures, or explained how he deviated from these national guidelines. Further, they have not suggested precisely what he should have done to prevent Hill's sexual assault. The fact that the sexual assault occurred is insufficient to place individual liability on Lewis for the policies and procedures that he implemented to avert this very occurrence. We find no

---

31. Lewis explains in his affidavit that the DRYDC was located temporarily on Memorial Drive for two months from July 1, 1987, until September 1, 1987, while the new, innovative state facility was being completed. Although the new facility is equipped with audio-visual monitoring devices, Lewis states that it was financially impractical and unfeasible to install video monitoring devices at the temporary location. Unfortunately, the sexual assault on Hill occurred during the short time that the DRYDC was at the temporary location. There has been no representation that Lewis had any control over the temporary location of the DRYDC or that he had the ability to apportion funds for additional monitoring during that time.

clearly established constitutional law in August, 1987, violated through the *policies and procedures* implemented by Lewis in his supervisory capacity as Director of the DRYDC. The Hills have failed to show that he did not demonstrate good faith intent in instituting these policies and procedures. Accordingly, Lewis is entitled to qualified immunity in his individual capacity.

▇ The basis for individual liability for Wilkinson is even more attenuated. As Director of Youth Services for the Georgia Department of Human Resources, Wilkinson avers that he has responsibilities for the Division of Youth Services statewide. His office is at the state Department of Human Resources; he is not regularly at the DRYDC and does not supervise those employees directly. When the state assumed control of the DRYDC on July 1, 1987, personnel, who formerly worked for Dekalb County for six months prior to June 30, 1987, were transferred into comparable positions at the facility as employees of the Georgia Department of Human Resources, Division of Youth Services, subject to a background check to determine if they had criminal records. Wilkinson reviewed all of the criminal record background checks on those Dekalb County employees who desired to transfer to state employment with the Department of Human Resources, Division of Youth Services. He attests that this screening was performed in accordance with the American Correctional Association Standards for Juvenile Detention Facilities. While a few former Dekalb County employees were not eligible for state employment, none of the employees who are defendants in this case had a criminal record that precluded them from employment at the DRYDC.

Wilkinson also served on a committee responsible for developing policies for the operation and maintenance of youth detention centers for consideration by the Director of the Division of Youth Services. He suggested policies for screening, training and supervising employees at state juvenile detention centers. Some of these policies and procedures were designed to identify employees with a potential for assaulting residents, to encourage employees to report inappropriate conduct by coworkers, and to counsel employees. The Director of the Division of Youth Services, Majorie H. Young, and not Wilkinson had final decisionmaking authority. She based decisions regarding the operation of the DRYDC on the American Correctional Association Standards for Juvenile Detention Facilities.

Wilkinson cannot be liable individually to the Hills for *suggestions,* whether or not implemented, that he made as a committee member. The critical determination for imposing liability under section 1983 is ascertaining the particular official with " 'final policymaking authority.' " *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion)); *see Owens v. Fulton County,* 877 F.2d 947, 950 (11th Cir.1989) (per curiam) ("[W]hether a particular official has final policymaking authority for § 1983 purposes is a matter of state law."). Wilkinson and Young's affidavits clarify that Young was the final decisionmaker, and she is not a party in this case.

Wilkinson also cannot be faulted for his *screening* of the former Dekalb County employees to determine if they were eligible for state employment. The individual defendants in this case did not have criminal records, and the Hills have not contended that they did or specifically stated how the screening process was constitutionally flawed. Wilkinson performed in good faith the requested background screening using the criteria that he was given. He violated no clearly established constitutional law in August, 1987, with respect to Hill's constitutional rights. Wilkinson could not have known or divined that individuals with no criminal backgrounds would sexually assault Hill.[32] There simply is no causal connection.

---

32. *Cf. Parker,* 862 F.2d at 1477 (sheriff ineligible for qualified immunity for hiring and promoting chief county jailer who kidnapped and raped female arrestee because "minimal investigation" into his background would have revealed that jailer had been "convicted of indecent exposure"; treated for "a variety of mental problems, including memory lapses, talking to himself, and

Wilkinson also is entitled to qualified immunity in his individual capacity.

## C. Dekalb County

■■ The Hills maintain that Dekalb County is liable under section 1983 for violating Hill's Eighth Amendment rights because policies and procedures implemented by Dekalb County remained unchanged after the juvenile detention center was transferred to the state. Consequently, they argue that Dekalb County continues to be responsible for Hill's sexual assault and subsequent, allegedly unreasonable delay in medical care. Dekalb County asserts that it had no control over the juvenile detention center after its transfer to the state. In denying summary judgment to Dekalb County, the district court was persuaded by the Hills' argument concluding that "Dekalb County originally hired and trained the personnel involved in the instant suit and set the policies which were continued after Dekalb County's relinquishment of the center." R6–130–6.

■■ Only "when execution of a government's policy or custom" is responsible for "inflict[ing] the injury," and thus is "the moving force of the constitutional violation" is the governmental entity liable. *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *see Farred v. Hicks*, 915 F.2d 1530, 1532–33 (11th Cir.1990); *Anderson v. City of Atlanta*, 778 F.2d 678, 685 (11th Cir.1985). "A plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity." *Colle v. Brazos County*, 981 F.2d 237, 245 (5th Cir.1993). Because the challenged governmental policy must have a "causal relation to the alleged constitutional violation," *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985), the Hills must "demonstrate some *affirmative link* between the *policy* and the *particular constitutional violation* alleged." *Anderson*, 778 F.2d at 685 (emphasis added).

multiple personality experiences; and he had a history of drug use").

"Deliberate indifference to serious medical needs may be shown by proving a policy of deficiencies in staffing or procedures such that the inmate is effectively denied access to adequate medical care." *Id.* at 687 n. 12. In *Anderson*, the persistent pattern or practice of understaffing at the Atlanta Pretrial Detention Center was causally related to the failure to discover and treat the serious medical need of a detainee, who was found dead in the morning after full rigor mortis had occurred, preceded by a coma, which resulted from acute barbiturate intoxication apparent when the detainee arrived at the detention center the night before. Because the City of Atlanta had not increased the staff at the Detention Center despite complaints of inadequate staffing, a deliberate indifference to serious medical needs was demonstrated that deprived the detainee of his life. *See Wellman v. Faulkner*, 715 F.2d 269, 272–74 (7th Cir.1983) (deliberate indifference at state prison evidenced not only by "repeated instances" of medical maltreatment, but also "general systemic deficiencies," such as doctors who did not speak English, no psychiatric care, and problems in providing medical supplies like waste-collection bags for inmates who had colostomies), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). Deliberate indifference or "reckless disregard" under the Eighth Amendment can be established by showing a " 'pervasive risk of harm.' " *Mooreman v. Sargent*, 991 F.2d 472, 474 (8th Cir.1993) (citation omitted).

Although the Hills contend that three prior incidences of sexual assault that occurred in 1983 and 1986, while the juvenile detention center was operated by Dekalb County, were sufficient notice that another sexual assault could occur, the record indicates that all of these assaults were committed by the same employee of the former Dekalb Juvenile Detention Center. With the termination and criminal prosecution of that former employee, neither Dekalb County nor the state, using its screening procedures, had reason to suspect that there was further danger of sexual assault on detainees from the staff.[33]

33. Coincidentally, the terminated, former Dekalb County employee has an identical first and last name as one of the individual defendants in this

Not only is a "single incident" an insufficient basis for governmental liability under section 1983, *Williams v. City of Albany*, 936 F.2d 1256, 1261 (11th Cir.1991) (per curiam), but also a "single or isolated incidents" of sexual assault will not impose governmental liability, *Mooreman*, 991 F.2d at 474. Sexual assaults must be frequent enough to cause prisoners to fear for their safety and to apprise prison officials of "the problem and the need for protective measures." *Id.* Thus, the Hills have not demonstrated that *any* governmental policy or procedure was an affirmative link to the sexual assault on Hill or the alleged delay in his medical attention. Specifically, they have not shown the liability of Dekalb County, even if its policies and procedures were adopted by the state following its acquisition of the juvenile detention center.

■■■■ It further appears to us that the Hills' claim that the policies and procedures at the DRYDC caused or facilitated the sexual assault of Hill and the alleged delay in providing him medical attention is merely an another method of challenging individual actions or decisions by Swain, Lewis and Wilkinson. Local governments cannot be subjected to section 1983 liability "based upon theories akin to *respondeat superior.*" *Tuttle*, 471 U.S. at 818, 105 S.Ct. at 2433; *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *see H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir.1986) ("It is axiomatic, in section 1983 actions, that liability must be based on something more than a theory of respondeat superior."). Thus, a local govern-

ment "cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. We have determined that the imposition of the " 'fault' element" in governmental liability is consistent with the rejection of vicarious liability in *Tuttle* and *Monell*. *Owens v. City of Atlanta*, 780 F.2d 1564, 1567 (11th Cir.1986).

■■■■ The Hills' argument fails principally because they have not established factually that Dekalb County had *any* control over the juvenile detention center after its transfer to the state or that the Georgia Department of Human Resources, Division of Youth Services did not institute its own policies and procedures. The liability of a local government is limited to acts that it has officially sanctioned or ordered. *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir.1989) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986)). It is undisputed that, effective July 1, 1987, pursuant to O.C.G.A. § 49–5–10(o) (1981) (repealed 1992),[34] the Georgia Department of Human Resources, Division of Youth Services, assumed control and jurisdiction of the former Dekalb Juvenile Detention Center located at 4451 Memorial Drive in Dekalb County, Georgia. Dekalb County relinquished the physical facility located on Memorial Drive for the state's use and terminated all positions for county employees there effective June 30, 1987.[35] Affidavits in the record confirm that the individual DRYDC employees named in this case became state employees on July 1, 1987. The juvenile

case, who is not involved in this appeal. They are not the same persons.

34. While the availability of county juvenile detention centers to become state property was effective July 1, 1981, this statute specifically provides that the Dekalb County juvenile detention center would not become state property until transferred or deeded by the county. Regarding the Dekalb Juvenile Detention Center on Memorial Drive, the state elected to build a new state-of-the-art juvenile detention center rather than taking the former Dekalb County facility. When the acquisition was formulated, it was expected that the state would assume control at the same time that the building of the new juvenile detention center was completed. Nevertheless, when the new facility was not completed as anticipated by the transfer date because of construction delays,

the state temporarily occupied the former Dekalb County facility, the site of Hill's sexual assault, on the transfer date of July 1, 1987, and remained there until September 1, 1987, when the DRYDC moved into its new building, also in Dekalb County, Georgia.

35. Although Dekalb County has represented that the state temporarily contracted with the county to maintain the physical facility of the juvenile detention center from July 1, 1987, to August 31, 1987, we find that this building maintenance is completely unrelated to the issues that we address in this appeal. That is, building maintenance is irrelevant to personnel policies and procedures necessary to show liability under section 1983 or the state law claims involved in this case.

detention center was renamed the Dekalb Regional Youth Detention Center, including the descriptive term "regional" because it serves not only Dekalb County, but also neighboring counties. As of July 1, 1987, the staff of the DRYDC were employees of the Georgia Department of Human Resources and paid by the state. The Hills have not identified a single Dekalb County employee involved with the sexual assault on Hill and his subsequent, allegedly unwarranted delay in medical attention.

 To the contrary, Young, the Director of the Division of Youth Services, attests that she is responsible for promulgation of all state policies for youth detention centers within the Division of Youth Services, including the DRYDC, and that those policies and procedures are based on the American Correctional Standards for Juvenile Detention Facilities. The Hills have not specified any of these national standards that are constitutionally deficient. Further, the fact that a number of former Dekalb County employees became state employees at the DRYDC does not show that Dekalb County had any authority over or responsibility for these employees as to the execution of their duties for the state. As Wilkinson averred by affidavit, the state conducted its own screening of the former Dekalb County employees and some were not employed by the state because they

had criminal records. The Hills have not explained any particular aspect of the screening process that they consider unconstitutional. Thus, we are unconvinced that the state did not use its own selection process for its staff at the DRYDC and implement its policies and procedures for operation of the facility, absolving Dekalb County of liability after June 30, 1987.[36]

Therefore, Dekalb County cannot incur liability for the sexual assault on Hill and alleged unreasonable delay in his medical attention because the Hills have failed to establish any causal connection through a county, as opposed to state, policy or procedure. The Hills' recharacterization of their claims against the individuals Swain, Lewis and Wilkinson is ineffective because any form of *respondeat superior* liability against a government is impermissible. Importantly, the Hills have not shown factually that Dekalb County had any control or jurisdiction over the DRYDC when the subject incident occurred. Accordingly, Dekalb County has no liability to the Hills and should have been granted summary judgment.

## III. CONCLUSION

In this interlocutory appeal, Swain, Lewis and Wilkinson contest the denial of their summary judgment motions based on quali-

---

**36.** We need not address Dekalb County's alternative argument on appeal that it is protected by Eleventh Amendment immunity if we had decided that it acted as an arm of the state, or that the county and state were joint tortfeasors. Because we conclude that Dekalb County had no control or jurisdiction over the DRYDC after June 30, 1987, Dekalb County had no responsibility for any policy or procedure alleged to have resulted in the sexual assault on Hill and alleged unwarranted delay in his medical attention. Similarly, Dekalb County cannot be liable for state law claims under theories such as negligent entrustment. Where there is no control, there is no responsibility.

Even if Dekalb County had any liability under state law, it is protected by state sovereign immunity. As a political subdivision of Georgia, a county and its officers sued in their official capacities have the same sovereign immunity protection as the state. *Toombs County v. O'Neal*, 254 Ga. 390, 330 S.E.2d 95 (1985). Georgia counties waive sovereign immunity to the extent that they have liability insurance coverage. *Kitchen v. CSX Transp., Inc.*, 6 F.3d 727, 731 (11th Cir.1993); *see Florida Int'l Indem. Co. v.*

*City of Metter*, 952 F.2d 1297, 1302 (11th Cir. 1992) ("A provision of the Georgia constitution of 1983 waived the sovereign immunity of the state and its departments and agencies, including municipalities, to the extent of the coverage of any liability insurance."); *Ward v. Bulloch County*, 258 Ga. 92, 93, 365 S.E.2d 440, 441 (1988) ("The county is not required to purchase liability insurance and is entitled to sovereign immunity in the absence of insurance....."). Importantly, Dekalb County did not maintain any liability insurance for the juvenile detention center that could be construed as a waiver of its sovereign immunity after June 30, 1987. In contrast, the state has admitted that it carries liability insurance from which it will obtain satisfaction of any judgments against the individual defendants at issue in this appeal, and that it is providing their defense, with the exception of the alleged perpetrators of Hill's sexual assault. Thus, Dekalb County would enjoy state sovereign immunity for Hill's sexual assault and alleged unreasonable delay in medical treatment on August 7, 1987, if it had any liability through control of the juvenile detention center, including its policies and procedures.

fied immunity and Dekalb County appeals denial of its summary judgment motion because it contends that it had no responsibility for the DRYDC at the time of Hill's sexual assault. Our review of the record establishes that the individual appellants are entitled to qualified immunity and that Dekalb County cannot be liable to the Hills because they have not shown that Dekalb County had any control over the DRYDC at the relevant time or that any Dekalb County policy or procedure resulted in the sexual assault on Hill or alleged unreasonable delay in his medical attention. Accordingly, we REVERSE and REMAND with instructions to grant the summary judgment motions of Swain, Lewis, Wilkinson and Dekalb County.