**Alan PALERMO et. al., Plaintiffs,**

v.

**CORRECTIONAL MEDICAL
SERVICES INC., et al.,
Defendants.**

**No. 99–0537–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

April 3, 2001.

Chris Livingston, Parker & Livingston Clinton, NC, for Plaintiffs.

Scott Distasio, Bales & Weinstein, P.A., Ryan Barack, Zinober & McCrea, Jaret Fuente, Bavol, Bush & Sisco, P.A., Tampa, FL, for Defendants.

*ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT OF LAN-ZA, CESARIO, AND DR. MALDO-NADO AND ORDER GRANTING IN PART MOTIONS FOR SUMMARY JUDGMENT OF CMS AND DR. FISHER*

MORENO, District Judge.

Plaintiffs have brought this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1367. Plaintiffs are a group of prisoners who are or were inmates committed to Everglades Correctional Institute ("Everglades"). They claim that their Eighth Amendment right to be free from cruel and unusual punishment has been violated due to the denial and delay of medical care. Motions for Summary Judgment were filed by Defendants Correctional Medical Services ("CMS"), filed on August 11, 2000, by Tony Lanza, filed on August 11, 2000, by Carla Cesario filed on August 11, 2000, by Dr. Hector Maldonado filed on August 11, 2000, and by Dr. Neil Fisher, filed on August 14, 2000.

The Court finds that genuine issues of material fact may exist solely for Plaintiff Freddie Mills. Accordingly, summary judgment is granted against all Plaintiffs at this time except Mills whose claim involves CMS and Dr. Fisher only. Oral argument shall be set by separate order for the summary judgment motions regarding Mills.

### Background

This suit involves multiple Plaintiffs who each has a unique medical history and claims. Every Plaintiff has brought a claim against CMS based on CMS's custom of deliberate indifference to the Plaintiff for CMS's custom of deliberate indifference to the serious medical needs. The

Plaintiffs have unique charges against Drs. Fisher and Maldonado, Lanza, and Cesario (the "individual Defendants") as set forth below.

### Alan Palermo

Plaintiff Palermo alleges that while he was incarcerated in Everglades, he suffered from serious back pain, but his medical needs were ignored by the prison staff. Palermo began to experience back pain in 1994, during a previous period of incarceration. Though there is no allegation or evidence of paralysis in Palermo, he has used a wheelchair since November 1997.

In December of 1997 while incarcerated at the North Florida Reception Center ("NFRC"), Palermo received a magnetic resonance imaging ("MRI") scan that revealed a degenerative disk disease. On February 10, 1998, Palermo was transported to a hospital in Jacksonville, FL to see a specialist in neurological surgery, Dr. Mark Spatola. Dr. Spatola determined that Palermo's L5–S1 spinal disk had ruptured and he recommended surgery. Palermo claims that he desired surgery, but that the staff at NFRC falsely and incorrectly recorded on his medical chart that he was deliberating surgery. Palermo did not receive surgery in the next several months after his meeting with Dr. Spatola while he was incarcerated at NFRC. There is no pending charge against NFRC.

Palermo was transferred to Everglades on June 8, 1998. The primary medical provider at Everglades during his incarceration there was Correctional Medical Services ("CMS"), a for-profit corporation. On June 25, 1998, Palermo was seen by Nurse Hanley–Gumbs at which point Palermo alleges that he apprized the nurse of his back pain. On August 14, 1998, Palermo was once again seen by Nurse Hanley–Gumbs and the medical records indicate that Palermo requested back surgery. As a result of this meeting, Palermo was prescribed Tylenol 3 containing codeine, which Palermo took until January of 1999. The chart from NFRC contained no documentation indicating that Palermo made any attempt to get surgery. Fisher Affidavit at ¶ 8.

On August 21, 1998, while being treated for a clogged ear, Palermo informed Defendant Dr. Fisher about his back pain. Upon notice of Palermo's complaints, Dr. Fisher advised Palermo of the procedure that he would have to go to sick call for his complaints about his back. Palermo did not return to sick call regarding his back before October 1, 1998, at which time he saw Dr. Fisher during a scheduled appointment with him. Palermo at 62–63.

During this October 1, 1998 examination, Palermo and Dr. Fisher discussed options for treating his back. At this point Dr. Fisher told Palermo that he would have a consultation with a specialist regarding his back. Dr. Fisher also approved the use of a foam mattress, though it is not clear whether this was as a result of this October 1 visit or a subsequent one.

On October 6, 1998, Palermo asked Defendant Lanza, the Everglades Medical Supervisor, and Price, the Everglades Chief of Security, for a foam mattress. Palermo's request was refused. Palermo was told that the steel bunk was good for his back and he would not receive an air mattress unless he paid for one.

Palermo experienced blood in his urine and was seen by Nurse Hanley–Gumbs on October 19, 1998, and then by Dr. Fisher on October 20, 1998. During this visit, Palermo was informed by Dr. Fisher that his request for back surgery had been denied and that they would treat his back medically instead of surgically. Palermo at 72. Palermo executed two Inmate Grievance Forms over the next two days.

On the October 20, 1998 grievance, Palermo sought surgery for his back stating as grounds that he had been diagnosed as needing surgery for his back at an earlier date. He explained that he was no longer able to get up from his wheelchair and that he was suffering in pain. The response to this grievance was that surgery had not been performed due to the February 23,

1998 report by Dr. Kahn, a doctor who had seen Palermo while he was incarcerated at NFRC. Dr. Kahn's report stated that Palermo had not made a decision regarding surgery. The response also stated that if Palermo had decided to undergo surgery he should go to sick call and notify the staff.

The October 21, 1998 grievance contains Palermo's request for a "proper seat cushion" and air tires for his wheelchair in order to accommodate a long term invalid since his surgery had been denied. The formal response to this request was that Palermo needed a determination by a health care provider to receive such devices.

Beginning November 2, 1998, Palermo was placed in administrative confinement in a non-wheelchair accessible cell for failing a drug test. During that period of confinement, on November 5, 1998, Palermo was brought out of confinement and was sent to a neurosurgeon, Dr. Aronson, outside of Everglades. Dr. Aronson determined that he needed an MRI before he made a decision regarding a surgery recommendation for two reasons, firstly, that he only had a radiologist's written report from Palermo's previous MRI but not the actual film, and, secondly, that the time period between the first MRI and this consultation was substantial enough that another MRI was warranted. Aronson at 13. This new MRI was performed on December 21, 1998 at South Miami Hospital.

Palermo also alleges that he received inadequate medical attention while in confinement, specifically that he did not have the assistance of his orderly and rarely received his prescription of Tylenol 3 though the staff knew of his severe pain. Palermo admits, however, that on November 9, 1998, he instructed a staff member to cancel his medication and cancel all neurosurgical matters.

Palermo's other grievance regarding his period in administrative confinement involved the timing of his release from confinement. Palermo was scheduled to be released prior to November 11, 1998. On that day he submitted an Inmate Request to be taken out of administrative confinement. On November 16, 1998 he received a formal response by Holmes that stated they had a shortage of beds, and that he would be released once there was a bed available. His release back to the general population occurred on November 17, 1998.

On November 20, 1998, Palermo submitted a Request for Administrative Remedy or Appeal of decisions by Dr. Fisher, Defendant Lanza, and Dr. Guida not to authorize air tires for his wheelchair. Palermo testified in his deposition that he asked Dr. Maldonado for air tires. Palermo admitted that Dr. Maldonado, however, was not his health care provider and Palermo also admitted that Dr. Maldonado stated that Palermo needed to contact his health care provider about the air tires. On January 11, 1999, Palermo's appeal regarding his request for air tires was denied because they posed a security risk. November 20, 1998 Administrative Appeal. Referenced in the response was the fact that Lanza had offered Palermo a wheelchair and the Plaintiff refused this offer on November 30, 1998. This wheelchair was new and was in some ways more desirable as it included padded armrests. Palermo at 221–2. Otherwise, the response found that Palermo's health care had been timely and appropriate. In addition to the response denying Palermo's request for air tires, on January 11, 1999, Palermo's request for a wheelchair with adjustable leg raises was denied. Dr. Maldonado did not partake in the decisions regarding these devices at all. Palermo at 203–5.

At some point in December of 1998, Palermo received an inflatable seat cushion, however, he claims that it inadequately relieved his pain. After an MRI had been performed on December 21, 1998, Palermo was again seen by Dr. Fisher on December 28, 1998. At this time, Dr. Fisher reordered Palermo's pain medication and wrote a consultation request for a follow up visit with Dr. Aronson.

On January 21, 1999, Dr. Maldonado discontinued Palermo's Tylenol 3 prescription and replaced it with Naprosyn. Palermo alleges that this was another instance of the deliberate indifference on the part of Defendants, as Dr. Maldonado's reason for discontinuing Palermo's medication was that Palermo did not look like he was in pain.

On January 27, 1999, Palermo refused transportation to his consultation appointment because there was no wheelchair accessible van. It is undisputed that Palermo's refusal was not based on a medical necessity. Palermo's expert, Dr. Aronson, never indicated to Palermo that he needed to be transported in a wheelchair with a wheelchair accessible van and stated in his deposition that it was not a medical necessity for Palermo to be transported by a wheelchair accessible van. Aronson at 20–21. On February 19, 1999, Palermo was again scheduled for a consultation with Dr. Aronson. On this date, Palermo was not transported to his appointment because a commanding officer ordered another officer to escort Palermo back to his dorm as there was no wheelchair accessible van. Palermo at 103.

Finally, on March 24, 1999, after receiving the results of the MRI, Dr. Aronson saw Palermo for his follow up and evaluated him. At this meeting Dr. Aronson recommended surgery. Surgery was performed on April 7, 1999.

After surgery was performed, Palermo's wheelchair was taken from him as there was no order stating that it was a necessity. Forcing the patient to walk, however, is a typical course of treatment explained the Plaintiff's own expert. In Dr. Aronson's opinion, a patient should be ambulatory the same day or the next morning after surgery. Aronson at 17.

Palermo stipulates that summary judgment should be entered in favor of Cesario on his claims.

### Lester Lane

Lane claims that he was not given the appropriate surgery to remove bullet fragments located near his spine. Lane was shot in 1990. In 1998, Lane was convicted for drug trafficking and sentenced whereupon it was noted that he would need medical attention in prison.

Before entering prison, Lane consulted with various doctors regarding his back problems. He was first referred to a spine specialist by the name of Dr. Ziebelman, who said that there was nothing he could do for Lane. Lane at 29. Lane was next seen by Dr. Barsa who evaluated Lane several times. Dr. Barsa first treated Lane with medication, but eventually recommended surgery to alleviate Lane's back pain. Lane at 30.

Lane was incarcerated with the Department of Corrections on December 4, 1998. On February 5, 1999, Lane was transferred to Everglades. Prior to his transfer, Lane requested a consultation with a specialist and was examined by Dr. Pineless. Lane did not receive permission to have a wheelchair after this visit. Upon his transfer to Everglades, Lane was seen by Dr. Fisher who issued him a wooden cane and continued all of his medications. In addition, Dr. Fisher also prescribed nortriptyline, a psychiatric drug. Lane at 66–7. Lane admits that at no time has he ever used a wheelchair. Lane at 67–8.

Lane's complaint with Dr. Fisher regarding his back is that Dr. Fisher did not refer Lane to a spinal specialist. Lane at 56. However, it is undisputed that Dr. Fisher ordered an x-ray and proffered a diagnosis of the x-ray to Lane on or about April 2, 1999. Lane at 39–40. Dr. Fisher assessed the x-ray and determined that Lane's back required no surgical or medical intervention. Fisher Affidavit at ¶ 19.

While Dr. Fisher was Lane's primary care physician, on at least one occasion, Lane was seen by Dr. Maldonado, Dr. Fisher's superior at the time. Lane claims that Dr. Maldonado did not diagnose Lane during his visit but simply looked at him and noted that Lane could stand and walk. As a result of a visitation on February 24, 1999 with Dr. Maldonado or another member of the medical staff at Everglades, Dr.

Maldonado issued a pass for no prolonged standing. Lane at 39.

Lane also alleges that he received inadequate medical treatment for his stomach. Lane alleges without providing any medical documentation that a Dr. Horner told him that he needed to undergo surgery to have his intestines periodically replaced due to the damage from the 1990 gunshot wound. For his stomach, Dr. Fisher directed Lane to obtain an antacid from the prison guards who were directed to distribute it. Lane at 60. It is Lane's opinion that this was inadequate treatment.

Another basis for an allegation by Lane of inadequate care is his wrist. Lane began complaining about it in January of 2000 and in March of 2000 a doctor at Everglades told Lane that there was nothing wrong with it and that he should soak it in a hot water compact. Lane at 63. Dr. Naya, a physician at Everglades, eventually prescribed a balm for what was perceived as arthritis of the wrist. Lane at 64.

Lane also had a lice problem. Lane admits that Dr. Fisher prescribed a special shampoo to treat it, but alleges that Dr. Fisher did not follow up on the treatment so Lane still had the problem at the time of his deposition in July of 2000. Lane at 64–5.

Finally, Lane alleges that he needed and was denied the use of orthopedic shoes. However, Lane admits that no one told him he needed these special shoes and that he had not utilized orthopedic shoes before he made this request. Lane at 58.

Lane filled out an inmate grievance on April 25, 1999. As grounds for the complaint he states, "Since certain doctors here at E.C.I. have a different opinion and diagnosis from other doctors and the doctors I had in society" they were showing deliberate indifference to his medical needs. As relief he requested a "second opinion from spinal, nerves and stomach specialists." April 25, 1999 Grievance. The response by Dr. Fisher states that Lane was examined on April 12, 1999 and April 20, 1999, and that no further diagnostic studies were clinically indicated on his record. Lane appealed this denial on May 10, 1999. The denial of Lane's appeal recites a brief history of the dates Lane was seen by Dr. Fisher and the treatment he received. Finally, Lane was informed that sick call was available to him for any problems he might experience.

Lane does not make any allegations against Dr. Maldonado or Lanza in the third amended complaint ("TAC").

## Malcolm Durkee

Durkee was incarcerated at Everglades beginning on September 10, 1998. Durkee complained of asthma, poor vision, and lower back pain. Durkee does not include any allegation against any Defendant regarding his vision or his asthma in the TAC. Nevertheless, Durkee admits in his deposition that he believes the doctors at Everglades treated his asthma appropriately. Durkee p. 30–1.

For Durkee's lower back pain, Dr. Fisher ordered an x-ray of his lower back within a week of a November 6, 1998 visit and wrote a pass for crutches that was continuously renewed. Durkee at 65. Durkee was prescribed pain medication, specifically Ibuprofen 800. Durkee at 67. Dr. Fisher followed up with Durkee on December 8, 1998. The x-ray did not reveal any missing cartilage. Fisher Affidavit at ¶ 23. Pursuant to Dr. Fisher's orders, Durkee was sent out for an MRI on February 18 or 19, 1999. Durkee at 66. That MRI revealed a radial tear disc herniation at L5–S1 and lumbar spondylosis. Nurse Dure discussed the results of his MRI with Durkee on May 3, 1999.

Dr. Fisher ordered a consultation with Durkee and the specialist, Dr. Aronson on July 1, 1999. Dr. Aronson described Durkee's symptoms as "very atypical for any nerve root problems." TAC at ¶ 289. Dr. Aronson stated that he "would have nothing to offer this patient" unless he saw a change between earlier and present MRI's. TAC at ¶ 289. A second MRI was performed in August 19, 1999. Durkee at

66. The radiologist's MRI report provided that "no change has occurred since 02–18–99." Fisher Affidavit at ¶ 32. Accordingly, Dr. Fisher did not send Durkee back to Dr. Aronson.

An "informal grievance" was submitted on February 29, 2000. Durkee stated that because he had not been given a wheelchair he needed pain medication. The response points out that Durkee has been given a pass for crutches and should report to sick call if his pain worsens. Durkee also filled out an inmate grievance on March 4, 2000 stating that Dr. Fisher would not issue authorization for a wheelchair and that the crutches were damaging his armpits. The response, dated March 27, 2000, stated that Durkee needed to go to sick call regarding this complaint and that Durkee was seen on February 11, 2000 and there was no notation of this problem. The appeal of this denial was submitted by Durkee on April 10, 2000. In addition to finding that the March 27 response was appropriate, the response to the appeal stated that wheelchair passes have to be ordered by the treating physician. The response notes that Durkee was again seen by Dr. Naya on May 5, 2000 and no wheelchair pass was issued.

Durkee does not make any claims against Lanza in the TAC.

Durkee also brings a count against Everglades for the failure to maintain the premises in a safe manner. Durkee alleges that he stepped into or his crutch was inserted into a hole in the sidewalk. This accident caused aggravation to Durkee's back.

### Dean Jenkins

Jenkins was incarcerated beginning July 1, 1997. He injured his knee while incarcerated, but prior to his transfer to Everglades on January 26, 1999. While Dr. Maldonado initially did not recommend Jenkins for surgery on his knee, surgery was authorized on March 10, 1999. On April 30, 1999, Jenkins received surgery on his knee. He alleges deliberate indifference on account of the delay and on account of the administration of his pain medication.

Jenkins was initially prescribed Motrin for his knee pain. On April 20, 1999, Jenkins informed Dr. Fisher that he was out of pain medication for his knee and that Motrin was causing him stomach pain and black tarry stools. Fisher Affidavit at ¶ 37. Dr. Fisher ordered Tylenol and salcalate, a medication that reduces pain and inflammation but does not irritate the stomach. Fisher Affidavit at ¶ 38. On April 30, 1999, the day of his surgery, Dr. Fisher prescribed Motrin for Jenkins's pain. Jenkins alleges that Tylenol 3 was also prescribed for the pain resulting from the arthroscopic surgery. On the day following the operation, Dr. Fisher changed the Motrin prescription to Tylenol and salcalate noting Jenkins's previous stomach and digestive problems. Fisher Affidavit at ¶ 39. It is at this point that Jenkins alleges that Dr. Fisher told him that pain never killed anyone.

Jenkins's second complaint stems from the alleged damage done to a pin placed in his hand prior to his incarceration at Everglades. As Jenkins's knee worsened, he needed aid in getting around. Dr. Maldonado initially supplied Jenkins with a crutches pass, but Jenkins claims that he could not use the crutches. Jenkins maintains that he next saw Dr. Fisher and obtained a walker pass.

Jenkins alleges that the use of the walker necessitated by his knee problem caused the pin in his hand to bend. Jenkins at 29–30. At all relevant times, however, including the time when he had a walker, Jenkins had a cane and a cane pass. Jenkins at 34. Jenkins stated in his deposition that he could not simply use the other hand because he needed it to defend himself presumably against other inmates. Jenkins at 56.

At a post-surgical examination performed by Dr. Kim on June 23, 1999, Dr. Kim noted that Jenkins's knee was doing well, but that he had a sharp pain in his hand due to a pin that was left behind

after a previous surgery. Dr. Kim recommended surgery and Dr. Fisher wrote the necessary consultation request on June 24, 1999. Fisher Affidavit at ¶ 43. Surgery was performed to remove the bent pin from Jenkins's hand on July 23, 1999.

Jenkins filed a grievance regarding the problems with his hand allegedly caused by the walker which was denied on August 9, 1999. TAC at ¶ 304. His appeal was denied on October 1, 1999. TAC at ¶ 305.

Jenkins stipulates that summary judgment should be entered for Cesario and Lanza as to his claims.

### Freddie Mills

Mills who was committed under the name Alfred Gentry was transferred to Everglades in 1996. In the record, all requests, appeals, and grievances bear the name Alfred Gentry. In 1998, Mills experienced frequent pain in his left hip and went to sick call on August 11, 1998. TAC at ¶ 356. On August 12, 1998, he was examined by Nurse Hanley–Gumbs who ordered pain medication and referred Mils to an orthopedic surgeon. Dr. Kim, the specialist, saw Mills on August 26, 1998 and diagnosed him with "avascular necrosis of left femoral head." On that same day, Dr. Fisher reviewed the consultant's report and recorded that Dr. Kim's diagnosis included a recommendation for a "bone graft procedure [left] femoral head *urgent* *." Dr. Fisher relied on Dr. Kim's consultant's report.

On September 17, 1998, Mills put in a request for his operation that was deemed urgent by Dr. Kim. Mills wrote that he had agreed to the operation and wished to know when it would take place. He stated that he was at times in unbearable pain. Mills was instructed at that time to wait for his appointment to be scheduled.

On December 27, 1998, Mills filled out a grievance regarding his pain. Dr. Maldonado answered the grievance and wrote a second consultation request for an orthopedic surgeon and to schedule surgery from Everglades. Fisher Affidavit at ¶ 53.

On February 7, 1999, Mills again filled out a grievance stating that his surgery had not taken place despite Dr. Kim's assessment that surgery was urgent. Mills was seen by Nurse Hanley–Gumbs on February 23, 1999 and reported that he was still awaiting his surgery. The nurse noted that she had notified Faith Douglas who is in charge of scheduling appointments. Fisher Affidavit at ¶ 54. On March 2, 1999, Dr. Maldonado responded to the February 7 complaint by noting that Mills's visit with Hanley–Gumbs addressed his complaint and made the issues in his grievance moot. Mills appealed this response by Dr. Maldonado and stated that he had not yet received surgery and therefore the issue was not moot. March 8, 1999 Administrative Appeal. In the denial of the appeal on April 20, 1999, it was determined that the previous response by Dr. Maldonado on March 2, 1999 was adequate and that his procedure had been approved. The staff was simply waiting for a date.

On March 5, 1999, Mills filed a request for surgery. Faith Douglas responded on March 31, 1999 and informed Mills that he had been approved for surgery. In April of 1999, Dr. Maldonado reviewed a consultant's report from Dr. Kim's staff dated April 15, 1999. This report requested new x-rays prior to scheduling Mills's procedure. Fisher Affidavit at ¶ 55. A new x-ray was scheduled and taken on April 19, 1999. On May 27, 1999, Dr. Fisher noted that these x-rays were sent to Dr. Kim, so he filled out a consultation request noting that Mills was scheduled for surgery. On June 23, 1999, Dr. Kim examined Mills and noted that he was still having pain in his hip, Dr. Kim scheduled a follow up visit for the following week.

On July 8, 1999, Mills was again x-rayed. The report noted that there was avascular necrosis in the left femoral head, but no definite findings in the right femoral head. Fisher Affidavit at ¶ 57. Mills went to sick call on July 16, 1999 complaining of hip pain. Dr. Fisher wrote a consultation re-

quest for a bone graft on August 3, 1999. In a note dated August 16, 1999, Dr. Kim stated that there was no need for further evaluation or surgery, Dr. Fisher agreed with this assessment. Fisher Affidavit at ¶ 60.

Mills stipulates that summary judgment should be granted for Cesario for his claims.

### Hugo Salazar

Salazar admits that he has not followed the recommended diet for treating his diabetes. Salazar stipulates to summary judgment in favor of Dr. Fisher for the allegations involving his diabetes and the discontinuance of Glucophage. Plaintiffs' Statement of Facts p. 10. Salazar also admits that it would be difficult to hold Dr. Maldonado responsible as well. Salazar does not stipulate that summary judgment should be granted for his foot problems.

Salazar received orthopedic shoes on October 3, 1997. TAC at ¶ 396. Though they were supposed to last only one year, he had not received replacements as of the filing of the TAC. On June 23, 1999, Salazar filed a grievance that his shoes had worn out and Dr. Fisher had refused to order new shoes. On June 24, 1999, Salazar filed a grievance regarding the pain in his right knee that was causing him pain. On August 24, 1999, a response was given for the latter grievance. The response stated that Salazar had been given a prescription for several months of pain medication on February 4, 1999. The response also stated that Salazar was offered a left ankle brace for support, and that his diabetic condition could be the cause of the increased pain.

An appeal dated August 30, 1999 referenced the denial of the special shoes and also Salazar's ankle problems. The response to the appeal found that Salazar's issues were appropriately addressed, and that special shoes and a specialty consult has not been deemed a medical necessity. Salazar makes no claims against Dr. Maldonado or Lanza in the TAC.

### Ravindranauth Sugrim

Sugrim transferred to Everglades on August 28, 1998. On October 8, 1998, Sugrim complained to Nurse Hanley–Gumbs that he has a fractured patella which required surgery in 1990. In 1997, a procedure was performed on Sugrim's knee that he claims irritated it and bent the wires that had been placed in his knee from the earlier surgery. The nurse issued him passes for the low bunk, no prolonged standing, no shaving, a cane, no stair climbing, and gave him a knee support.

An x-ray was taken of his knee in October of 1998. These x-rays revealed that there were minimal degenerative changes. On November 4, 1998, Sugrim complained that he had not seen the films of the x-ray taken of his knee. On November 9, 1998, Sugrim complained of stiffness in his knee and again received the above mentioned passes.

On April 1, 1999, Sugrim was seen by Nurse Dure who noted that Sugrim's knee had a bony deformity and scarring. She noted that there was no tenderness, effusion, erythema, or swelling. Fisher Affidavit at ¶ 93. There was no clicking or popping at this time. Nurse Dure continued his restrictions by renewing his passes.

On April 6, 1999, Sugrim complained that his knee was in ongoing pain, and that the screw from his surgery had to be removed because it was bothering him. Nurse Prince noticed a bulge in his knee and the scars, but also noted that his gait was steady. The nurse instructed him to take Tylenol as needed.

Sugrim also complained about his eyesight on April 6, so he was referred for an eye examination. Dr. Fisher noted after his eye exam that Sugrim's vision was $^{20}/_{20}$ with glasses and in his left eye 20/30. Sugrim's vision did not meet the DOC's criteria for optometry referral. Fisher Affidavit at ¶ 95.

Sugrim failed to show up for a scheduled appointment on April 27, 1999. On July 29, 1999, Dr. Fisher examined Sugrim's knee and noted that Sugrim "moves quickly, turns rapidly, had no cane, and no gait disturbance." Fisher Affidavit at ¶ 95. Dr. Fisher recalls that on this date the wires were not piercing the skin. Fisher Affidavit at ¶ 96. In his deposition Sugrim testified that the wires have not penetrated the skin since May 4, 1999. Sugrim at 33. Dr. Fisher did not see a need for further work-up or a secondary consult. Fisher Affidavit at ¶ 95.

Sugrim does not make any allegations against Dr. Maldonado or Lanza in the TAC and stipulates that summary judgment should be entered in favor of Cesario and Lanza on his claims.

### Correctional Medical Services

In addition to the cumulative evidence of the medical mistreatment of the numerous Plaintiffs involved in this action, Plaintiffs submit a report by Correctional Medical Authority that conducts surveys every three years to determine whether inmates are getting the minimum level of care. Plaintiffs contend that conditions at Everglades worsened from 1997 when Pri–Med, CMS's predecessor and assignor, provided medical services for Everglades to February of 1999 when CMS was providing medical services. In both reports, Everglades was toward the bottom of healthcare operations in the entire Florida DOC. The report expressed concern about the lack of documentation of the presenting symptoms and physician follow up care. Physical Health citation—Level I. Also an area of concern was that laboratory tests were not reviewed in a timely manner and follow up was not consistently ordered.

### Standard

Summary judgment is authorized when there is no genuine issue of material fact. *Fed.R.Civ.P.* 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position. A jury must be able reasonably to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Analysis

#### A. Eighth Amendment Standard for Prisoners

The Supreme Court established the standard for Eighth Amendment cases involving the medical needs of prisoners in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Court held that in order to prove an Eighth Amendment violation, the plaintiff must show that the defendant acted with deliberate indifference to the serious medical needs of the prisoner. *Id.* at 104, 97 S.Ct. at 291. This indifference can be manifested by prison doctors in their response to the prisoner's needs or by prison guards who intentionally deny or delay access to medical care or intentionally interfere with the treatment once prescribed. *Id.* at 104–05, 97 S.Ct. at 291.

#### 1. Physicians

Not every claim made by a prisoner that medical treatment has been inadequate states an Eighth Amendment violation. *Id.* at 105–6, 97 S.Ct. at 291–2. Negligent conduct by state officials with regard to an inmate's serious medical condition does not rise to the level of a Constitutional violation, and therefore cannot be the basis for a § 1983 suit. *Id.* at 105–7, 97 S.Ct. at 291–3. Neither inadvertent failure to provide adequate medical care nor a physi-

cian's negligence in diagnosing or treating a medical condition states a valid claim of medical mistreatment under the Eighth Amendment. *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1186 (11th Cir.1994) (citing *Estelle,* 429 U.S. at 105–6, 97 S.Ct. at 292).

■ Rather, in order to state a cognizable claim under the Eighth Amendment, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Medical malpractice does not become a constitutional violation simply because it is alleged by a prisoner. *McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir.1999) (quoting *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292).

### 2. Supervisors

To recover individually from those who were in a supervisory administrative capacities, such as Lanza and Cesario, the Plaintiff must show that they are liable either through their personal participation in the acts comprising the alleged constitutional violation or the existence of a causal connection linking their actions with the violation. *Hill,* 40 F.3d at 1192. Supervisory officials are not liable under § 1983 on the basis of *respondeat superior* or vicarious liability. *Hardin v. Hayes,* 957 F.2d 845, 849 (11th Cir.1992).

The components of deliberate indifference as expressed by the Eleventh Circuit are (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. *McElligott,* 182 F.3d at 1255. Summary judgment must be granted for the defendants "unless the plaintiff presents evidence of the official's subjective knowledge." Id. (quotations omitted).

### B. Deliberate Indifference

In order to survive a motion for summary judgment, the plaintiff must demonstrate (1) a serious medical need; and (2) deliberate indifference to that need. *Hill,* 40 F.3d at 1186; *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291.

### 1. Serious Medical Need

A "serious medical need" is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Hill,* 40 F.3d at 1187 (citations omitted). "In Estelle, the Court recognized that medical needs constitutionally requiring medical attention ranged from the 'worst cases,' producing 'physical torture or a lingering death,' to 'less serious cases,' resulting from the 'denial of medical care,' which could cause 'pain and suffering.'" *Id.* at 1186 (quoting *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290).

The Eleventh Circuit has found that a variety of medical conditions satisfy this standard. *See, e.g., McElligott,* 182 F.3d at 1256–7 (failure to further diagnose and treat severe pain of deteriorating condition); *Brown v. Hughes,* 894 F.2d 1533 (11th Cir.1990) (a broken foot received in a fight that remained untreated for hours); *Powell v. Lennon,* 914 F.2d 1459 (11th Cir.1990) (forcing inmate to stay in a dormitory filled with friable asbestos constituted deliberate indifference to plaintiff's serious medical needs).

### 2. Deliberate Indifference

The "deliberate indifference to serious medical needs" standard has an objective and a subjective component. *Hill,* 40 F.3d at 1186. The objective component is "contextual and responsive to 'contemporary standards of decency.'" *Id.* (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992)). To establish that a health care provider's acts constitute deliberate indifference to a serious medical need, treatment must be so grossly incompetent, inadequate, or excessive as to shock conscience or to be intolerable to fundamental fairness. *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986). The subjective component requires knowl-

edge of the need for medical care and intentional refusal to provide that care. *Hill,* 40 F.3d at 1186. For a defendant to be "deliberately indifferent," there must be evidence in the record of such subjective awareness of the medical need. *McElligott,* 182 F.3d at 1255.

Depending on the circumstances and the length of the delay, a delay in treatment can constitute deliberate indifference. *Id.* (citing *Harris v. Coweta County,* 21 F.3d 388, 394 (1994) (deliberate indifference could be inferred from unexplained delay in treating a known or obvious serous medical condition)); *Brown,* 894 F.2d at 1538–9 (finding that delay of a few hours in treating an inmate's broken foot could constitute a violation of the Eighth Amendment). The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. *McElligott,* 182 F.3d at 1255. For example, delaying medical treatment for non-medical reasons, such as coercing payment, can show deliberate indifference sufficient to establish a constitutional violation. *Hill,* 40 F.3d at 1190 n. 26. An unexplained delay in medical treatment could constitute deliberate indifference. *Brown,* 894 F.2d at 1538–39. However, a defendant must purposefully ignore or fail to respond to a prisoner's pain or medical need in order for deliberate indifference to be established. *Id.* at 1191. An official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay. *McElligott,* 182 F.3d at 1255 (citing *Lancaster v. Monroe County, Alabama,* 116 F.3d 1419, 1425 (11th Cir.1997)).

Deliberate indifference may also be established where treatment is shown to be grossly inadequate or based on a decision to take an easier but less efficacious course. *McElligott,* 182 F.3d at 1255 (citing *Steele v. Shah,* 87 F.3d 1266, 1269–70 (11th Cir.1996); *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989)). When the need for treatment is obvious, medical care which is so cursory as to amount to no care at all may also amount to deliberate indifference. *McElligott,* 182 F.3d at 1255. However, matters for medical judgment such as whether to order an X-ray or like measure does not represent cruel and unusual punishment, even if the action or lack thereof evinces medical malpractice. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293.

## C. Application to Individual Defendants

### 1. Alan Palermo

■ Palermo's medical condition meets the "serious medical need" test. *Hill,* 40 F.3d at 1187. The Plaintiff suffered from constant, severe back pain which greatly limited his mobility. Moreover, in February of 1998, Dr. Spatola, a specialist in neurological surgery, determined that the Plaintiff's spinal disk at L5–S1 had ruptured, impinging on the sciatic nerve and recommended surgery to relieve the pain and to allow the Plaintiff to walk again. While at Everglades, beginning August 14, 1998, Palermo was prescribed Tylenol 3, a controlled substance not ordinarily prescribed unless there is a serious condition—especially in a prison setting. Within a year, Palermo received two MRIs on his back, and eventually received surgery.

Palermo must overcome a substantial burden and demonstrate that a reasonable juror could find that the acts by Defendants constitute deliberate indifference to a serious medical need. In response to the affidavits and the deposition testimony offered by the defense in support of their motion, Palermo must present evidence that there is a genuine issue of fact that his treatment was be so grossly incompetent, inadequate, or excessive as to shock conscience or to be intolerable to fundamental fairness. *Rogers,* 792 F.2d at 1058.

Though surgery was recommended on February 10, 1998, Defendants CMS, Fisher, Maldonado, and Lanza cannot be held responsible for Palermo's treatment prior to his June 8, 1998 transfer to Everglades.

Palermo did not report to sick call until June 25, 1998, and there is no allegation that he requested surgery at that time. It is not until August 14, 1998, that Palermo alleges he requests back surgery in the presence of an agent of CMS.

*Estelle* makes clear that medical judgment calls are not grounds for deliberate indifference, nor is medical malpractice. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293. As a result of this August 14, 1998 visit, Palermo was prescribed Tylenol 3 for his pain. Though he was told to report to sick call by Dr. Fisher on August 21, 1998, Palermo did not in fact report to sick call to obtain different treatment for his back prior to his October 1, 1998 appointment with Dr. Fisher.

On October 1, 1998, Dr. Fisher evaluated Palermo's condition and stated that he would authorize a consultation with a specialist. In late October of 1998, prior to Palermo's appointment with a specialist, Dr. Fisher determined that it was appropriate to and that Palermo's back would be treated medically instead of surgically. *Estelle* clearly held that a medical judgment call is not grounds for a finding of deliberate indifference. *Estelle*'s holding in essence insulates a doctor's medical judgment call from review by a court in the § 1983 context. Accordingly, Dr. Fisher's choice of treatment does not amount to deliberate indifference even if it might otherwise be grounds for medical malpractice.

Despite Dr. Fisher's determination, nevertheless, Palermo's consultation with a specialist proceeded as scheduled. Palermo was seen by Dr. Aronson on November 5, 1998. A second MRI was ordered and took place on December 21, 1998.

Approximately one month after the MRI was taken, Palermo was scheduled for a follow up visit with Dr. Aronson. It was at this time that Palermo refused transportation in anything but a wheelchair accessible van. When he was next scheduled to follow up with Dr. Aronson in February of 1999, a wheelchair accessible van again was not available so Palermo was not transported. Thereafter, on March 24,

1999, Palermo did see Dr. Aronson, surgery was scheduled, and surgery was performed on April 7, 1999. There is no evidence of grossly negligent, inadequate, or indifferent behavior against any medical personnel.

Palermo's claim against Dr. Maldonado for cancelling his Tylenol 3 prescription and replacing it with Naprosyn in January of 1999 also must fail under *Estelle* as this is a medical judgment call.

As to Lanza, there is no evidence in the record that Lanza refused to issue Palermo any medically prescribed device. To the contrary, there is evidence that the administrators were sensitive to Palermo's needs as they offered him a new wheelchair, which was refused, back in 1998.

Though Palermo undoubtedly suffered because of his back problem, none of the delays were unexplained and nothing in the record shows that his treatment at CMS was grossly incompetent, inadequate, or excessive. *Brown*, 894 F.2d at 1538. He received pain medication, consultations with the specialist, and eventually surgery. Accordingly, no reasonable juror could find that the actions by any Defendant were so egregious as to shock the conscience or to be intolerable to fundamental fairness. *Rogers*, 792 F.2d at 1058.

### 2. Lester Lane

Lane has complaints about the treatment for his back, wrist, lice, stomach, and about the denial of orthopedic shoes. The pain in his wrist was diagnosed as needing a hot water compact and a balm for the discomfort. His lice was treated as well by having a special shampoo prescribed. Lane admits that no one told him he needed orthopedic shoes; he alone felt the need for them. Lane states that a Dr. Horner recommended surgery on his stomach so that his intestines could be replaced every few years due to the injury sustained by the gunshot would suffered in 1990. Dr. Fisher, in his affidavit, explains that he examined Lane and made a judgment about the severity of this prob-

lem. Dr. Fisher recommended using antacid to alleviate his discomfort. Lane has offered no evidence to rebut Dr. Fisher's affidavit. To be a serious medical need under the deliberate indifference standard, the ailment must be diagnosed by a physician as mandating treatment or that even a lay person would recognize as needing a doctors attention. *Hill*, 40 F.3d at 1187. The wrist, lice, stomach, and denial of special shoes are not serious medical needs under the *Hill* test.

■ Lane's back problems, however, meets the serious medical need test. Lane's back problems began in 1990. Prior to his incarceration in 1998, the record reflects that Lane saw two doctors, one of whom determined that there was nothing he could do for Lane's back, the other recommended surgery. Furthermore, Dr. Fisher judged that Lane's back problem was serious enough to order an X-ray. Accordingly, this Court finds that Lane's back constitutes a serious medical problem.

Lane complains that Dr. Fisher did not refer Lane to a spine specialist after Dr. Fisher had ordered an x-ray of Lane's back. Dr. Fisher did diagnose Lane's film in his presence, but did not refer him to a specialist. *Estelle* spoke directly to these sort of allegations when the Court held, "[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293. Under the circumstances, therefore, there is no genuine issue of material fact for a jury to decide.

### 3. Malcolm Durkee

#### a. Section 1983 Claims

■ The TAC contains a complaint by Durkee related to his lower back only. His ailment meets the serious medical needs test as it was dire enough for Dr. Fisher to order an x-ray, two MRIs, and a consultation with the neurosurgical specialist. *Hill*, 40 F.3d at 1187.

Durkee's back was examined by Dr. Fisher in November of 1998. He was prescribed medication to ease his pain. By December of 1998 he had been x-rayed and had received diagnoses of his x-ray. Durkee was administered an MRI in February of 1999, and the result were discussed with him in May of 1999. He saw Dr. Aronson, the neurosurgeon, on July 1, 1999. Dr. Aronson ordered another MRI, which was performed in August of 1999, and stated that he only needed to see Durkee again if there was a change from the first MRI. The radiologist's report of the MRI from August revealed that there was no change. Accordingly, Dr. Fisher did not refer Durkee to Dr. Aronson again. Durkee has failed to present any evidence that his treatment was be so grossly incompetent, inadequate, or excessive as to shock conscience or to be intolerable to fundamental fairness. *Rogers*, 792 F.2d at 1058.

Durkee also complains that Dr. Fisher would not authorize a wheelchair for him, only crutches that bothered Durkee's armpits. This is a clear example of a medical judgment made by a physician that *Estelle* held would not amount to deliberate indifference. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293. Accordingly, there is no genuine of issue of material fact on Durkee's § 1983 count.

#### b. Premises Liability

With no remaining federal claim, this Court declines to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Durkee's state law premises liability claim. Thus, Durkee's premises liability claim is dismissed.

### 4. Dean Jenkins

■ Jenkins received surgery on both his knee and his hand in 1999. Complaints surrounding the treatment of these medical needs form the basis of Jenkins's allegations against Defendants. Since these

conditions were serious enough for surgery, this Court finds that they meet the serious medical needs prong. *Hill,* 40 F.3d at 1187.

Jenkins transferred to Everglades on January 26, 1999, and received authorization for his knee surgery on March 10, 1999. The surgery was performed on April 30, 1999. While Jenkins alleges that this delay evinces deliberate indifference on the part of the Defendants, the circumstances clearly weigh against a finding of deliberate indifference under the Eleventh Circuit's opinions. *Harris,* 21 F.3d at 394; *McElligott,* 182 F.3d at 1255. Though his prescription was changed after his knee surgery due to his medical history, Jenkins was not denied pain medication by Dr. Fisher at that time. Durkee has failed to present any evidence that his treatment was so grossly incompetent, inadequate, or excessive as to shock conscience or to be intolerable to fundamental fairness. *Rogers,* 792 F.2d at 1058.

Jenkins also alleges deliberate indifference regarding the treatment of his hand. Jenkins was issued a walker pass by Dr. Fisher to assist him during the period when he was experiencing knee problems. Jenkins claims that he informed Dr. Fisher that this would damage his hand due to the pin that was placed inside of it during a previous surgery. However, at all times Jenkins had a pass to use a cane instead of the walker.

Once Jenkins complained of the pain to Dr. Kim on June 23, 1999. The necessary consultation request was completed by Dr. Fisher on June 24, 1999, and surgery was performed on July 23, 1999 to remove the bent pin. Assuming for summary judgment purposes that Dr. Fisher was made aware of this potential future problem, the circumstances might show negligence, but clearly do not show deliberate indifference. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293. Furthermore, the timing of his surgery under these circumstances do not indicate deliberate indifference to Jenkins's needs.

### 5. Freddie Mills

■ On August 26, 1998, Mills was diagnosed by Dr. Kim as needing an urgent bone graft procedure on his left femoral head. Although nearly a year later, on August 16, 1999, Dr. Kim determined that there was no further need for evaluation or surgery, Mills's complaints about the treatment for his hip problem clearly rise to the level of a serious medical need.

Despite Dr. Kim's August 26, 1998 recommendation, and requests by Mills on September 17, 1998, December 27, 1998, and February 7, 1999, Mills did not receive surgery. It was not until February 23, 1999 that Nurse Hanley–Gumbs contacted Faith Douglas followed up on Mills's complaint. Mills filed a request for surgery that was approved on March 31, 1999. Over seven months had passed between Dr. Kim's initial recommendation and this approval, and yet the ultimate decision to cancel surgery was not made for another four months. Though subsequent x-rays were taken and Dr. Kim eventually determined that there was no need for surgery in August of 1999, a genuine issue of material fact may exist as to whether the delay in treatment demonstrated deliberate indifference on the part of Dr. Fisher and Dr. Maldonado, both of whom had subjective knowledge about Mills's condition.

There is no evidence in the record, however, that Lanza had any subjective knowledge of Mills's condition as required by *McElligott.* *McElligott,* 182 F.3d at 1255. Accordingly, summary judgment is granted for Lanza.

### 6. Hugo Salazar

■ Salazar's sole remaining complaints after his stipulations in his response to Defendants' motions for summary judgment involve the denial of orthopedic shoes. Salazar received orthopedic shoes while incarcerated in October of 1997. At the time, there was a notation that they were to be replaced in a year, but they were not. Salazar complained of foot pain to Dr. Fisher who examined him for this

and other ailments including his diabetes. Salazar was given an ankle brace for his difficulties as well as pain medication. Salazar has obtained no medical evidence to rebut the evidence offered by Dr. Fisher regarding his medical judgment. The need for orthopedic shoes under these circumstances is not a serious medical need. *Hill,* 40 F.3d at 1187. Furthermore, Salazar has proffered no evidence that evinces deliberate indifference by anyone. No genuine issue of fact exists on Salazar's claim.

### 7. Ravindranauth Sugrim

■ Sugrim experienced discomfort because of the screw or pin that had been placed in his knee during surgery prior to his transfer to Everglades on August 28, 1998. An x-ray was taken of his knee in October 1998. Numerous examinations were performed by the nurses at Everglades and Dr. Fisher. Nothing indicates that there was anything serious about Sugrim's knee, or that it required serious medical attention such as surgery. On July 29, 1999, Dr. Fisher noted that Sugrim "moves quickly, turns rapidly, had no cane, and no gait disturbance." Fisher Affidavit at ¶ 95. Sugrim has presented no evidence that a physician mandated treatment. Accordingly, Sugrim's knee does not meet the serious medical need standard. *Hill,* 40 F.3d at 1187.

Sugrim's vision was recorded as 20/20 with glasses and 20/30 in his left eye. His vision did not meet the standards for an optometry referral. As his vision is nearly perfect in one eye, and was correctable with the glasses that Sugrim possessed, this Court finds that his vision does not constitute a serious medical need. *Id.*

### D. Application to Correctional Medical Services

■ It is well established that a municipality can not be held liable for the torts of its agents or employees under *respondeat superior. Monell v. Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). *Monell* holds that when the execution of a policy or custom made by its lawmakers, or by those whose edicts or acts may be said to represent official policy inflicts an injury, the municipality can be held responsible. *Id.* at 692, 98 S.Ct. at 2036. The Eleventh Circuit applies *Monell's* policy or custom in suits against private corporations performing traditional public functions. *Buckner v. Toro,* 116 F.3d 450 (11th Cir. 1997).

Plaintiffs concede in their reply memorandum that CMS can not have a policy of deliberate indifference because officials of the Florida DOC impose policy on CMS. Plaintiffs however oppose the notion that CMS can not have a custom of deliberate indifference. Plaintiffs point out that a widespread practice, however, though not authorized by written law or express policy that is so well settled as to constitute a custom can be the basis for liability. *Monell,* 436 U.S. at 695, 98 S.Ct. at 2037–8.

Defendants argue that the failure of the Plaintiffs to establish that their constitutional rights have been violated preclude a finding of liability for CMS. It almost goes without saying that there can be no custom of deliberate indifference to a Plaintiff's Constitutional rights for those Plaintiffs who have not suffered a Constitutional tort. Thus, the issue about whether CMS had a custom of deliberate indifference is only relevant to Plaintiff Mills.

A genuine issue of fact exists as to whether CMS had a custom of denying or delaying surgery. Mills's claims could lead a reasonable juror to find that there was a custom of deliberate indifference at CMS. The report by Correctional Medical Authority that expressed concern about the follow up procedures at Everglades also presents an issue of fact for the jury. Accordingly, an issue of material fact exists as to whether CMS had a custom of deliberate indifference.

### Conclusion

CMS's motion for summary judgment is GRANTED in PART. Summary Judgment is granted for CMS against all Plaintiffs

except Freddie Mills. Lanza's motion for summary judgment is GRANTED in full. Cesario's motion is GRANTED in full. Dr. Maldonado's motion also is GRANTED in full. Dr. Fisher's motion is GRANTED in PART against all Plaintiffs except Mills. Mills's claims against CMS and Dr. Fisher may contain genuine issues of material fact preventing summary judgment, thus oral argument shall be held on such claims.